1  Maxwell V. Pritt (SBN 253155)
       mpritt@bsfllp.com
2  Joshua I. Schiller (SBN 330653)
       jischiller@bsfllp.com
3  Beko O. Reblitz-Richardson (SBN 238027)
       brichardson@bsfllp.com
4  BOIES SCHILLER FLEXNER LLP
   44 Montgomery Street, 41st Floor
5  San Francisco, CA 94104
   Telephone:     (415) 293-6800
6  Facsimile:     (415) 293-6899

7  Reed D. Forbush (*pro hac vice forthcoming*)
       rforbush@bsfllp.com
8  BOIES SCHILLER FLEXNER LLP
   333 Main Street
9  Armonk, NY 10504
   Telephone:     (914) 749-8200
10 Facsimile:     (914) 749-8300

11 *Counsel for Plaintiffs Applied Underwriters, Inc.*
   *and Applied Risk Services, Inc.*

12

13              **UNITED STATES DISTRICT COURT**

14            **EASTERN DISTRICT OF CALIFORNIA**

15

| | |
|---|---|
| 16  APPLIED UNDERWRITERS, INC., a Nebraska corporation; and APPLIED RISK SERVICES, INC., a Nebraska Corporation, | NO. |
| 17 | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR:** |
| 18         Plaintiffs, | |
| 19 | **(1)  VIOLATION OF THE DUE PROCESS CLAUSE;** |
| 20      v. | **(2)  VIOLATION OF THE EQUAL PROTECTION CLAUSE;** |
| 21  INSURANCE COMMISSIONER OF THE STATE OF CALIFORNIA RICARDO LARA, in his official capacity; CALIFORNIA DEPARTMENT OF INSURANCE DEPUTY COMMISSIONER KENNETH SCHNOLL, in his official capacity; CALIFORNIA DEPARTMENT OF INSURANCE DEPUTY COMMISSIONER BRYANT HENLEY, in his official capacity; and DOES 1-20. | **(3)  VIOLATION OF THE TAKINGS CLAUSE;** |
| 22 | **(4)  VIOLATION OF THE TAKINGS CLAUSE FOR EQUITABLE RELIEF; AND** |
| 23 | **(5)  VIOLATION OF THE FIRST AMENDMENT** |
| 24 | |
| 25 | **DEMAND FOR JURY TRIAL** |
| 26         Defendants. | |
| 27 | |

28

                                                              COMPLAINT

1   Plaintiffs Applied Underwriters, Inc. ("Applied") and Applied Risk Services, Inc. ("ARS,"

2   and together with Applied, "Plaintiffs"), by and through its attorneys, allege, upon personal

3   knowledge of their own acts and status, and upon information and belief as to all other matters, as

4   follows:

5   **INTRODUCTION**

6   1.   This lawsuit arises from the initiation and perpetuation of an unlawful and bad faith

7   campaign by Insurance Commissioner of the State of California Ricardo Lara ("Commissioner"),

8   California Department of Insurance Deputy Commissioner Kenneth Schnoll ("Schnoll"), and

9   California Department of Insurance Deputy Commissioner Bryant Henley ("Henley," and together

10   with the Commissioner and Schnoll, "Defendants") to punish and harm Plaintiffs through the

11   conservatorship of California Insurance Company ("CIC"), a company once but no longer affiliated

12   with Applied, and other unlawful acts.  As detailed herein, Defendants have unlawfully obtained

13   and abused their authority over CIC to cause substantial, ongoing, and irreparable harm to both

14   Plaintiffs.

15   2.   Plaintiffs bring this action only after repeated and good faith attempts over several

16   months to end Defendants' abusive and unlawful campaign against Plaintiffs and resolve the

17   ongoing harm to Plaintiffs' businesses and reputations.  Unfortunately, Defendants have used those

18   discussions as a bait and switch to further their unlawful scheme by exercising authority over CIC

19   to hold it hostage in order to threaten and harm Plaintiffs, without any jurisdiction or lawful power

20   over them.

21   3.   As part of the parties' discussions, Defendants demanded that Applied – a non-

22   California corporation not subject to the conservatorship or any of the underlying proceedings

23   involving CIC – agree and adhere to a "rehabilitation" plan that Defendants seek to impose on CIC

24   in the Superior Court of California, County of San Mateo.  Among other onerous and improper

25   provisions, the proposed "rehabilitation" plan would require that Applied forever release any and

26   all claims against Defendants, and the right to bring this and any other lawsuit against Defendants

27   for harms they have inflicted, despite the fact that Applied itself is not in conservatorship or affiliated

28   with CIC.

---

1                                                   COMPLAINT

4.    Defendants' vendetta against Plaintiffs and their principals appears to be fueled by a belief that this Court made incorrect rulings in separate litigation between CIC policyholders, on the one hand, and CIC, Applied, ARS, and other entities, on the other hand, regarding a Reinsurance Participation Agreement ("RPA") entered into between these policyholders and Applied Underwriters Captive Risk Assurance Company, Inc. ("AUCRA"), which was an Applied affiliate at the time.

5.    To the apparent dissatisfaction of Defendants, this Court found that this policyholder litigation is not suitable for class treatment and rejected policyholders' claims that the RPA is void as a matter of law.  *See Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, Nos. 2:16-cv-158 WBS AC, 2:16-cv-1211 WBS AC, 2019 WL 358517 (E.D. Cal. Jan. 29, 2019); *Pet Food Express, Ltd. v. Applied Underwriters, Inc.*, No. 2:16-CV-01211 WBS AC, 2019 WL 4318584 (E.D. Cal. Sept. 12, 2019).

6.    Since then, instead of respecting and abiding by this Court's decisions, Defendants have unlawfully sought to obtain and wield power over CIC as a means to override the Court's decisions and punish CIC and Plaintiffs, far exceeding any power Defendants may legitimately have under California law and in violation of Plaintiffs' constitutional and statutory rights.  Defendants have unlawfully sought to force not only CIC but also Applied to settle all policyholder disputes statewide in identical manners – exactly the type of class-like treatment the federal courts rejected – and to do so by providing these policyholders with the option to disregard their contractual obligations under the RPA – essentially voiding the RPA as a matter of law contrary to federal court rulings.

7.    As explained further below, Defendants' attempt to overrule this Court's rulings stems from CIC's attempt to redomesticate to New Mexico following Defendants' unreasonable and repeated bad faith refusal "to approve or disapprove" the sale of CIC from Berkshire-Hathaway to CIC's CEO, Steven Menzies ("Menzies"), purportedly because of the policyholder litigation. Defendants used CIC's redomestication attempt to bring an unnoticed *ex parte* hearing in San Mateo Superior Court to place CIC in conservatorship alleging that it attempted a merger without prior consent.

COMPLAINT

8.      Defendants acted and continue to act in bad faith.  The *ex parte* application was sought without notice to CIC or Plaintiffs despite the parties' near-constant communication for months, and CIC already voluntarily agreed not to pursue the merger that was supposedly the subject of the *ex parte* application.  Without CIC present to contest the application, Defendants obtained the conservatorship under false pretenses by, among other things, never informing the superior court that the Commissioner attended a New Mexico approval hearing and did not object to CIC re-domesticating in New Mexico, and representing that the merger presented no risk to California policyholders.

9.      There is and can be no valid basis for a conservatorship of CIC or the resulting harm that it has and continues to cause Plaintiffs, as Defendants previously represented that "***because of CIC's considerable capital, surplus, and deposits, the proposed merger presented no risk to California policyholders***."  Conservatorships are typically used where an insurer has solvency issues, and there are no such issues here.  CIC is financially sound, as recognized by Defendants, and there is no justification for Defendants' ongoing campaign to harm Plaintiffs through conservatorship of CIC.  Indeed, the stated "grounds" for the conservation order have long since been removed, if they ever existed, and the Order should have been vacated long ago under Insurance Code § 1012.

10.     In the near-year long period that CIC has been in conservation, Defendants have refused to resolve the conservatorship in good faith, instead seeking to inflict continued harm on Plaintiffs and demanding that Applied subject itself to jurisdiction, give up its right to bring this and other lawsuits, and bind itself to other onerous terms.  Up until October 19, 2020, Defendants continued to propose unfair and preposterous terms under the constant threat that if Applied and others did not agree, they would seek court approval for a rehabilitation plan that would be "even worse."

11.     On October 19, 2020, Defendants made good on their threat and filed a lengthy and punitive non-consensual rehabilitation plan (the "Rehabilitation Plan"), which harms Plaintiffs in at least three ways.  *First*, Defendants' filings contain unfounded attacks on CIC, Applied, and others, which will further injure Plaintiffs in their business and goodwill.  *Second*, the Rehabilitation Plan

would require CIC's existing California policies be assumed by another insurer, eliminating servicing of those policies by Plaintiffs.  This would completely eliminate the revenues Plaintiffs anticipated under their valid and binding agreements with CIC, imposing at least tens of millions of dollars in losses in existing business on Plaintiffs.  *Third*, in complete  disregard of this Court's ruling and Plaintiffs' rights, the Rehabilitation Plan seeks not only to force resolution of approximately 50 separate proceedings, some of which do not even involve CIC, but any and all future claims against Plaintiffs involving the RPA.  Without jurisdiction over Plaintiffs, and without due process, Defendants propose that Plaintiffs nonetheless be required to enter into settlements in those proceedings—even proceedings where CIC is not a party and Applied is currently owed money.

12. Defendants' filings in connection with the Rehabilitation Plan acknowledge that "***CIC's financial status has remained stable***" and that "***CIC's AM Best credit rating remains at its pre-conservation A (Excellent) level***," but otherwise seek to disparage CIC and Plaintiffs.  These actions are just the latest example of the extreme overreach by and bad faith of Defendants, with their ongoing efforts to leverage the CIC conservation to substantially and irreparably harm Plaintiffs.

13. Defendants' conduct in obtaining the conservation order under false pretenses and then attempting to coerce Applied and other parties *not in conservation and not affiliated with CIC through corporate ownership* into punitive contract terms is a gross and unjustified misuse of Defendants' regulatory authority.  Defendants are not permitted to violate foundational federal constitutional principles to "correct" what they perceive were mistaken rulings by the courts (including this Court), to satisfy personal vendettas, or attempt to rehabilitate their political reputation.

14. Defendants' unprecedented actions in executing a years-long scheme to reverse Plaintiffs' legitimate litigation successes and to deprive Plaintiffs of their constitutionally protected rights by putting a financially thriving insurance company into indefinite conservatorship and now out of business has caused and is continuing to cause Plaintiffs to suffer unmeasurable and irreparable harm.

15.     Plaintiffs and CIC are parties to three servicing agreements: (1) a Management Services Agreement, through which CIC pays Applied for performing managerial services on CIC's behalf, including financial, investment, and loss prevention services; (2) an agreement through which Applied affiliate ARS serves as CIC's agent for underwriting workers' compensation insurance and processing premium payments, as well as other duties related to transacting insurance; and (3) a claims paying agreement.

16.     Applied's financial wherewithal depends on CIC's ability to provide the insurance policies to be serviced by Applied, provide supervision and instructions to ARS, and to fulfill its obligations to pay reimbursements and commissions specified by the contracts.  The reputational damage to CIC caused by the Commissioner's unjustified and apparently indefinite conservation and now the Rehabilitation Plan is causing Plaintiffs direct financial damage because there are fewer policyholders coming to CIC and therefore fewer policies for Plaintiffs to service.

17.     Defendants' interference with CIC's reputation in the marketplace has reduced its renewals and new business, which in turn directly harms Plaintiffs with reduced revenue. Defendants' actions are also harming Plaintiffs' reputations and goodwill.  Defendants' actions and tactics are an abuse of the Commissioner's regulatory authority and violate Plaintiffs' constitutional and statutory rights.

## THE PARTIES

18.     Applied is a Nebraska Corporation with its principal place of business in Omaha, Douglas County, Nebraska.

19.     ARS is a Nebraska Corporation with its principal place of business in Omaha, Douglas County, Nebraska.

20.     Ricardo Lara is the Commissioner of the California Department of Insurance ("CDI") and is a citizen of and an elected official in California, who upon information and belief currently resides in and/or is domiciled in Sacramento County.

21.     Kenneth Schnoll is Deputy Commissioner and General Counsel of CDI.  Schnoll is a citizen of and an elected official in California, who upon information and belief currently resides in and/or is domiciled in Sacramento County.

22.     Bryant Henley is Deputy Commissioner of CDI.  Henley is a citizen of and an elected official in California, who upon information and belief currently resides in and/or is domiciled in Sacramento County.

23.     Plaintiffs bring their claims against the Commissioner, Schnoll, and Henley in the official capacities of their titles as described in paragraphs 20 through 22.

24.     The true names of Defendants DOES 1-20, inclusive, whether individual, corporate, associate, or otherwise, are unknown to Plaintiffs.  Plaintiffs are informed and believe and thereon allege that each of the DOE Defendants is in some manner affiliated with the Commissioner or CDI.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, as Applied's claims arise under the Due Process, Equal Protection, and Takings Clauses of the United States Constitution, the First Amendment of the United States Constitution, and the Civil Rights Act, 42 U.S.C. § 1983.

26.     This Court also has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

27.     This Court additionally has jurisdiction and discretion to award attorneys' fees under 42 U.S.C. § 1988(b).

28.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1)-(2).  Defendants are considered to reside in this district because this is where they perform their official duties.

## FACTUAL BACKGROUND

**A.     The EquityComp® Program and Settlement with the Commissioner, and Resulting Litigation and Federal Court Decisions.**

29.     Applied and its affiliates primarily write workers' compensation insurance through multiple insurance companies in all fifty states in the United States, and have done so since 2002. CIC is the largest of those companies and was formed in 2004.  Since that time, CIC has grown into a company with over a billion dollars in assets and over $600 million in capital and surplus. Applied's group of insurance companies, which until October 2019 included CIC, has been

consistently rated A or A+ by A.M. Best, insures thousands of employers for workers' compensation insurance in fifteen states in the United States, and has been acknowledged as a leader in the workers' compensation marketplace.

30.     Before 2016, Applied's affiliates offered a workers' compensation program to California employers called EquityComp® ("EquityComp®").

31.     EquityComp® was a loss sensitive workers' compensation insurance program that both provided participant employers with workers' compensation insurance coverage required under California law and gave employers the opportunity to share in underwriting profits if their claims loss experience was favorable.   The profit sharing component was offered through a separate agreement, the RPA, with a separate company, AUCRA.

32.     EquityComp® was granted a Patent by the U.S. Patent Office in 2011 (No. US 7,908,157 B1).

33.     The CDI examined EquityComp® through no less than five financial and market conduct examinations over the course of a decade, and was fully aware of its existence, structure, and how it operated, including its "risk sharing features" and "accompanying Profit Sharing Plan." *See Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, 2017 WL 4652758, at *5 (E.D. Cal. Oct. 17, 2017).   CDI was well aware of EquityComp®'s structure and that AUCRA had separate profit-sharing agreements with employers which were not filed with the CDI.

34.     Nonetheless, on June 20, 2016, the Commissioner issued a Decision and Order holding that the RPA was an unfiled collateral agreement in violation of California Insurance Code § 11658 (among other Insurance Code provisions).   The Commissioner then issued a Notice of Hearing and Order to Cease and Desist on June 28, 2016, seeking an order requiring CIC and AUCRA to cease and desist from issuing policies incorporating the RPA.   CIC filed a Verified Petition for Peremptory Writ of Mandate (the "Writ Proceeding") challenging the June 20 Order.

35.     While the Writ Proceeding was pending, the parties executed a Stipulated Consent Cease and Desist Order on September 6, 2016, in which the parties agreed, among other things, that AUCRA could continue to enforce existing RPAs subject to small changes to the arbitral forum and run-off loss adjustment factor provisions.   On June 2, 2017, CDI, CIC, and AUCRA entered into a

1 | Settlement Agreement through which the parties agreed to dismiss the Writ Proceeding and that an

2 | Amended RPA would be filed allowing new RPAs to issue under EquityComp®.

3 |      36.     It was expressly agreed between the parties that the courts would decide the issue of

4 | whether any then-existing RPA was void and unenforceable.  In the years that followed, certain

5 | California employers who entered into EquityComp® brought lawsuits against Applied, CIC,

6 | AUCRA, and ARS seeking an order that the RPA was void.

7 |      37.     Some of this litigation took place here, in the United States District Court for the

8 | Eastern District of California, which has led to multiple orders by this Court related to the RPA,

9 | EquityComp®, and the rights of Applied, CIC, and AUCRA under EquityComp®.

10 |      38.     This Court denied class certification to California employers that entered into

11 | EquityComp®, finding "a class action is not superior to other available methods for fairly and

12 | efficiently adjudicating the controversy."  *Shasta Linen Supply*, 2019 WL 358517, *7.  This Court

13 | also found the RPA is not void as a matter of law.  *Pet Food Express*, 2019 WL 4318584.  No appeal

14 | of this order was undertaken.

15 |      39.     Defendants seek to override these express findings by this Court through an

16 | unprecedented procedure of placing CIC into a conservatorship, asserting Plaintiffs are affiliates,

17 | and undistinguishable from CIC, and forcing settlements of  all existing *and potential* claims by

18 | EquityComp® participants in identical manners—exactly the type of class-like treatment this Court

19 | rejected; and (2) as part of those settlements, offer EquityComp® participants the option of

20 | disregarding the RPA—essentially voiding the RPA as a matter of law contrary to this Court's order.

21 |
22 |      40.     By abusing the Commissioners' powers to force Applied into a class-like settlement

23 | that voids the RPA, Defendants are depriving Plaintiffs of their rights under the U.S. Constitution

24 | and federal law and seeking an end-around this Court's orders.  Moreover, Defendants are harming

Plaintiffs financially through reputational damage to CIC and to Plaintiffs directly.

25 |
**B.**    **Proposed CIC Sale, CIC's Diligent and Extensive Efforts To Satisfy the CDI's**

26 |        **Demands, and the CDI's Bad Faith Delay and Disapproval of the Sale of CIC.**

27 |      41.     Because the Commissioner agreed CDI would leave the RPA-related litigation to the

28 | Defendants needed a pretext to assert the Commissioner's power over Plaintiffs after this

1  Court issued orders inconsistent with how Defendants thought the litigation should be decided.  This

2  opportunity arose in 2019 through the Commissioner's statutory powers to regulate domestic

3  insurers, such as CIC.  As detailed below, Defendants used the Commissioner's powers in bad faith,

4  arbitrarily and capriciously, and in such a way that lacks any reasonable basis or legitimate

5  regulatory purpose.  This is an abuse of power in violation of Plaintiffs' rights under the U.S.

6  Constitution and federal law.

7       42.     In January 2019, Menzies, who was an indirect owner of 11.5% of CIC's shares,

8  entered into an agreement with Berkshire Hathaway, Inc. ("Berkshire")—which at that time owned

9  81% of the holding company that indirectly owned CIC—to purchase Berkshire's interest in CIC

10 (the "Berkshire/Menzies Agreement").

11      43.     A related part of the above transaction involved the sale of Applied to a third-party.

12 Applied's business was, to a large extent, servicing CIC policies (collecting the premium, etc.) and

13 providing payroll services.  Following the transaction, Applied was no longer affiliated with CIC,

14 but its income stream and value (along with the income stream and value of ARS) remained deeply

15 dependent on providing policy and payroll services to CIC policyholders.

16      44.     The Berkshire/Menzies Agreement included a $50 million "breakup fee" if the

17 transaction could not be completed by September 30, 2019.  Applied, Menzies, and CIC

18 immediately set about informing Defendants of the proposed sale, including the closing date and

19 $50 million penalty, and filing all the necessary paperwork to obtain the CDI's approval in time to

20 ensure timely completion of the deal.

21      45.     To provide Defendants with substantial advance notice, Menzies, as the ultimate

22 controlling person proposed to acquire control of CIC, submitted a "Form A" on April 9, 2019, more

23 than five months before the sale closing deadline of September 30, 2019 ("First Form A").

24      46.     A "Form A" submission to insurance regulators is used when a person proposes to

25 acquire control of an insurer by offering to acquire voting securities.  The First Form A explained

26 that Menzies, who was the President and Chief Executive Officer of CIC, was offering to acquire

27 control of CIC through transactions with Berkshire, the indirect parent of CIC.

28

47.    The First Form A explained that the Berkshire/Menzies Agreement was valued at over $700 million and was structured by Berkshire to require closing with all regulatory approvals on or before September 30, 2019, or a $50 million non-refundable deposit ("break-up fee") would be forfeited by Menzies, putting CDI on notice that September 30 was a time of the essence date.

48.    After an initial review of the First Form A, the CDI requested that Menzies provide supplemental information, and Menzies promptly agreed to do so.  At no point did the CDI indicate the review process could not be completed by September 30, 2019.  Menzies thus agreed to withdraw the First Form A and refile.

49.    Menzies submitted a second Form A on June 12, 2019 to address information sought by CDI ("Second Form A").  In response, CDI once again requested additional information—including information the CDI previously found unnecessary—and Menzies agreed to submit another Form A.  CDI did not indicate the review process could not be completed by September 30, 2019 and, on August 29, 2019, Menzies agreed to withdraw the Second Form A and refile.

50.    Menzies submitted a third Form A on September 7, 2019 ("Third Form A").  In response, CDI sought limited additional information, in communications dated September 13, 19 and 24, 2019.

51.    Each of CDI's e-mails requesting either additional documents or clarification was responded to promptly and thoroughly, and each response included a request to meet and confer with CDI on any other outstanding matters to ensure that the closing deadline would be met.  CDI did not raise any issue as to its capacity to complete the Form A review prior to Berkshire's September 30, 2019 closing deadline.

52.    By what appeared to be the final paperwork necessary for approval, on September 24, Laszlo Komjathy, Jr. ("Komjathy"), a CDI attorney, requested copies of corporate resolutions, which CIC provided to CDI on September 25.  Komjathy did not indicate any requests were outstanding.  Accordingly, preparations for the September 30, 2019 closing were initiated.  Applied and CIC also obtained necessary approval from the Insurance Departments of Iowa, Texas, and Hawaii required to close the transaction.

53.     But on the afternoon of Friday, September 27, 2019, without prior notice or indication, and on the final business day before the September 30, 2019 Berkshire deadline, Komjathy e-mailed CIC, stating CDI would "neither approve nor disapprove the pending application prior to September 30, 2019," the deadline for consummating the sale without forfeiture of the $50 million deposit.  In his cover e-mail, Komjathy indicated he was "out of the office" on Friday, September 27, directed CIC to contact Bryant Henley if it had questions, and made no mention of the substantial financial risk to Menzies created by CDI's dilatory review process.

54.     Multiple attempts to reach Henly and CDI's General Counsel, Kenneth Schnoll, were made immediately after receiving the September 27 email.  Those calls were not returned.  Thus, on the last business day before Berkshire's September 30 transaction deadline—a deadline the CDI knew would result in the forfeiture of $50 million—CDI notified Menzies that its point regulator was "out of the office," and the person appointed to take his place refused to return any calls.

55.     In sum, notwithstanding Applied's, Menzies's, and CIC's diligence and acquiescence to CDI's numerous demands throughout the regulatory approval process, including filing *three* separate Form A documents to address all issues raised by the CDI, on September 27, 2019, one business day before the known closing deadline, the CDI suddenly declared it could not approve or disapprove the Form A or the sale between Menzies and Berkshire despite months of notice and review.

## C.     The CIC Merger Proposal and the CDI's Full Knowledge of the Merger and Failure To Object.

56.     Facing a $50 million penalty for delaying the Agreement's consummation, Applied, Menzies, and CIC were left scrambling for a solution and negotiated a short, 10-day extension of the closing, at a cost of $10 million (not to be credited against the purchase price) in addition to the previously approved purchase price.

57.     Over the following days, numerous additional calls to various officials at CDI went unanswered.  Accordingly, Menzies contacted the New Mexico Superintendent of Insurance, John G. Franchini ("Superintendent Franchini" or "Superintendent"), to determine if the transaction could instead be approved under the supervision of New Mexico's Insurance Department.

58.     Superintendent Franchini proposed to re-domesticate CIC to New Mexico under an expedited approval process, permitting the sale approval and closing before the extended deadline. With no legitimate alternative, Applied, CIC, and Menzies worked with the Superintendent to finalize the sale and obtain all necessary approvals, including the formation of a new entity in New Mexico, California Insurance Company II ("CIC II"), which would ultimately merge with CIC.

59.     Superintendent Franchini informed Defendants of this process, communicating with the Commissioner and other pertinent insurance departments to obtain approvals.   The communications culminated in a conference call and Form A approval hearing (required by statute) on October 9, 2019, of which Defendants were provided advanced notice.

60.     At least three senior officials represented Defendants at the October 9 hearing (including Komjathy, one of the CDI's attorneys).   The CDI officials were *specifically asked whether they objected to the merger or the sale's consummation*, yet none objected during the conference call or during the Form A hearing where the Superintendent ultimately approved the merger.   Rather, CDI attorneys told the Superintendent that "because of CIC's considerable capital, surplus and deposits, the proposed merger presented no risks to California policyholders."   Nor did Defendants object or even respond when Berkshire informed CDI by letter on October 9, 2019, that it would proceed with the closing on October 10, 2019, based on the lack of objection at the Form A hearing.

61.     The hearing officer recommended the approval of CIC's Form A, and Superintendent Franchini issued an Order specifically noting CDI participated in the hearing and did not object.   A copy of the Order was sent to the Commissioner by e-mail the same day, and again the Commissioner did not object.

62.     Following Superintendent Franchini's Order, Berkshire sent the Chief Staff Counsel for the New Mexico Department of Insurance and the Commissioner, through Komjathy, an e-mail which advised, based on the lack of objection being filed at the Form A approval hearing, that Berkshire planned to proceed with the scheduled closing on October 10, 2019.

63.     Once again, Defendants did not object, even though CDI was specifically and unambiguously advised that, based on CDI's participation through its attorneys, and lack of

1    objection during the New Mexico Form A approval hearing, Berkshire intended to close the
2    transaction as scheduled on October 10, 2019 beginning at 9:00 a.m. Eastern Daylight Time.

3        64.    In the evening of October 9, 2019, after the New Mexico hearing during which CDI
4    made no objection, and while CIC executives were in route to New York to close the following day,
5    Defendants, through Komjathy, arbitrarily and capriciously reversed CDI's position on the merger
6    and sent CIC an e-mail alleging the Third Form A had been abandoned due to the anticipated merger.
7    The e-mail gave Menzies 10 business days from October 9, 2019 to voluntarily withdraw the Third
8    Form A.  That communication cannot serve as a written objection by the Commissioner because at
9    that point any objections would have been untimely:  CDI did not object at the morning conference
10   call or the official New Mexico hearing, and any objection also would have been contrary to the
11   CDI's express representations to Superintendent Franchini, who had by then issued an Order
12   approving the merger.

13       65.    Not until a week later did Defendants, through Komjathy, belatedly and untimely
14   offer a position on the merger retracting his earlier consent.  In an October 18, 2019 letter,
15   Defendants, through Komjathy, asserted several legal conclusions, including that after the merger
16   of CIC into CIC II, CIC's certificate of authority "will be extinguished by operation of law and the
17   surviving entity will not be qualified to transact insurance in California."  These objections are
18   meritless and confirm that the Commissioner is and was acting in bad faith and that its after-the-fact
19   "about face" on the merger was arbitrary and capricious.

20       66.    In sum, after New Mexico's Superintendent approved the merger and Berkshire and
21   Menzies completed the sale—relying on CDI's non-objection—Defendants unexpectedly reversed
22   course, claiming CDI never approved the sale or the merger.  Defendants further asserted that the
23   merger of CIC into CIC II would somehow revoke CIC's authority to provide insurance in
24   California.  But as it would turn out, Defendants' pattern of misleading Applied and delaying
25   regulatory and legal process in bad faith for extralegal and personal purposes was just getting started.

26

27

28

**D.     Defendants Conceal Their Intent To Put CIC Into Conservation, and the Commissioner Misrepresents His Willingness for a Negotiated Agreement To Further His Political Ambitions.**

67.     For more than two weeks between October 18 and November 4, 2019, CIC and Defendants were in discussions about Defendants' concerns about the merger.  Defendants asked CIC to refrain from taking any further steps to consummate the merger during this discussion period, and CIC complied.  During those talks, Defendants never informed CIC they were contemplating *ex parte* court intervention.

68.     Around October 23, 2019, Schnoll, CDI's General Counsel, and Komjathy telephoned CIC's General Counsel.  During that conversation, Schnoll asked whether the merger of CIC and CIC II had been completed and, if it had not, specifically requested that CIC and CIC II refrain from doing so since CDI wanted to meet and resolve the Form A and merger issues.  Relying on that request, CIC voluntarily refrained from taking any further action on the proposed merger.

69.     Although Schnoll indicated that CDI would respond to any media requests, CDI, CIC, and CIC II agreed they would not issue any additional press releases.  Again, neither Schnoll nor Komjathy indicated that the Commissioner intended to take *ex parte* legal action.

70.     Immediately following his telephone call with Schnoll and Komjathy, CIC's General Counsel contacted outside counsel and asked him to arrange for a meeting with Schnoll.  Despite outside counsel's numerous attempts to contact Schnoll after the October 23, 2019 call, Schnoll did not respond until after November 4, 2019.  Schnoll offered no justification for this unreasonable delay.

71.     On November 4, 2019, without any notice to CIC or justification given the timeline of events and consistent approvals described above, the Commissioner filed an *ex parte* application in San Mateo County Superior Court requesting the imposition of the extraordinary remedy of placing CIC in conservatorship under the Commissioner's authority (the "Application").

72.     The Commissioner made this *ex parte* request despite having expressly represented to their New Mexico counterpart that the CIC merger posed absolutely no risks to California policyholders.  The Commissioner failed to inform the San Mateo court of this fact, or any other facts in the paragraphs above, in his November 4, 2019 application.  Much to the contrary, the

COMPLAINT

1    Commissioner told the court the opposite: that the Order was necessary to "protect[] … the State's

2    policyholders and the public."  There is no reasonable basis or legitimate regulatory purpose for this

3    misrepresentation to the court, or the *ex parte* request.

4          73.     On November 4, 2019, based upon the Commissioner's misrepresentations, the San

5    Mateo court issued an order imposing a conservatorship over CIC placing it under the

6    Commissioner's control under California Insurance Code section 1011(c), which authorizes

7    conservatorship where an entity, "without first obtaining the consent in writing of the

8    [C]ommissioner, has transferred, or attempted to transfer, substantially its entire property or

9    business or, without consent, has entered into any transaction the effect of which is to merge,

10   consolidate, or reinsure substantially its entire property or business in or with the property or

11   business of any other person" (the "Conservation Order").  The Conservation Order, in addition to

12   the financial damage referenced above, has also caused Plaintiffs significant reputational harm.

13   **E.     The Commissioner's *Ex Parte* Application Misrepresents Facts Concerning Unrelated
14           Regulatory Matters.**

15         74.     Not only did the Commissioner omit key facts from his Application relating to CDI's

16   knowledge of and failure to object to the merger, but the Application is also misleading in many

17   other material respects.  For example, the Commissioner accused CIC of "flouting" regulatory

18   processes in connection with EquityComp®.  This allegation was (and still is) false and irrelevant

19   to the conservatorship application.  The Commissioner's invocation of EquityComp® reveals the

20   extent to which his actions since unreasonably delaying the approval of the Form A applications

21   have been improperly motivated by bad faith, his own personal political ambitions, and the desire

22   to rehabilitate his personal reputation.

23         75.     Nothing regarding EquityComp® has provided any legitimate basis for Defendants'

24   actions and the harm caused to Plaintiffs.  Starting in 2006, CDI examined EquityComp® and was

25   fully aware of its operation.  CDI objected to neither its sale nor marketing.  In a report of

26   examination of CIC for the year ending on December 31, 2006 ("2006 Examination Report"), CDI

27   described the program's structure in detail:

28

The profit sharing plan is similar to an incurred loss retro plan.  The profit sharing plan allows the insured to share in the benefit of good loss experience at the risk of bearing the cost of unfavorable loss experience, within the limits of the plan.  Under the profit sharing plan, the profit and risk components are accounted for through protected cell accounts in the Company's affiliated captive risk facility, Applied Underwriters Captive Risk Assurance Company.

76.     CDI reviewed and reported on the EquityComp® program over the next eight years without objection.  As stated by the Honorable William B. Shubb of this Court, it *cannot* be inferred that CIC "actively concealed the structure of the insurance program or the existence of the RPA from regulators, plaintiffs, or the public generally."  *Shasta Linen Supply*, 2017 WL 4652758, at *5 ("*Shasta Linen*").  The Court further found CIC "disclosed in program documents that the RPA is not a filed retrospective rating plan, and detailed how the profit sharing would work" and "it does appear that the [California Department of Insurance] was aware of the RPA's existence," and that CIC described its operation in its annual Reports of Examination over the course of many years.

77.     In June 2017, as part of a settlement agreement between CDI and CIC, and more than two years before the Conservation Order and events involved here, CDI approved an EquityComp® program that is substantively identical to the previous sold program, except for minor details.

78.     In addition to this Court, other courts have also rejected the argument that CIC flouted the regulatory process in connection with EquityComp®.  Most recently, for example, in November 2019, the Honorable Henry Walsh of the California Superior Court in the County of Ventura issued a written decision after a full trial on the merits which affirmed the enforceability of CIC's Policies against a challenge by one of its insureds who claimed the policies "flouted" the regulatory process.  *Roadrunner Management, et al. v. Applied Underwriters*, et al., No. 56-2017-00493931-CU-CO-VTA (Nov. 12, 2019).

79.     The Commissioner failed to disclose any of this information in his *ex parte* Application to the San Mateo court.  Instead, the Commissioner falsely accused CIC of a "pattern of flouting California regulatory processes" and did so without disclosing that: CDI reviewed and was aware of the EquityComp® program and its operation for many years without objection; the program's details and operation were publicly disclosed in a federal patent; and that, even after CDI decided that certain aspects of the EquityComp® program did not comply with regulations, CDI

and CIC entered into a settlement agreement allowing CIC to sell an amended version of EquityComp® that is substantively the same, with only minor changes. Nor did the Commissioner disclose in his Application that multiple courts have rejected the allegation that CIC "flouted" regulations in upholding some or all of the program.

**F.     The Commissioner Imposes Bad Faith, Unreasonable Demands To Resolve the Dispute and Lift the Conservatorship, Including a Demand To Settle All Ongoing Litigation.**

80.     Soon after the Conservation Order was issued, CIC filed an application to vacate it, on November 14, 2019 ("Application to Vacate"). After negotiations between CIC and Defendants, Defendants once again acted in bad faith by agreeing that the Commissioner would publicly confirm, among other things, that the conservation effort was based on regulatory issues, not financial impairment, and "to negotiate in good faith to ameliorate the adverse consequences to CIC of the conservation." Such a public statement would have helped restore the reputations of Plaintiffs. Based upon that agreement and Defendants' representations that it would take no further action harmful to CIC in the conservation, CIC withdrew its application to lift the conservatorship of CIC on the understanding that Defendants would work with CIC, in good faith, to resolve their dispute and lift the conservatorship as expeditiously as possible.

81.     Defendants again failed to live up to their agreement or act in good faith. The Commissioner did not make the public statements, as he agreed to, about the nature of the conservatorship and CIC's good financial standing. Indeed, the Commissioner did nothing to help alleviate harm to Plaintiffs and CIC arising from the conservation.

82.     On the contrary, Defendants did not even begin to discuss the substance of their purported regulatory issues with CIC for five-and-a-half weeks after the Conservation Order, despite CIC's repeated requests. By the time Defendants finally sent CIC an initial "rehabilitation" proposal on December 13, 2019, Applied and CIC had experienced significant negative effects as a result of Defendants' unlawful campaign and acts, including in connection with the Conservation Order obtained by the Commissioner's misrepresentations.

83.     Further, when Defendants finally presented a "rehabilitation" plan, it was clear the plan was not intended to help "conserve" CIC or its business as the Conservation Order provides,

since the plan made no reference to assisting with Form A approval or helping CIC obtain the CDI's approval of the merger.  Instead, the "rehabilitation" plan effectively eliminates CIC's business in California, and other states, requires CIC to transfer its business to a new insurer of the Commissioner's choosing, and leaves just a shell CIC with all of its obligations to other reinsurers and affiliates under its contracts and no source of revenue to meet its obligations.

84.     In connection with their "rehabilitation" plan for CIC, Defendants specifically target and seek to harm Applied.  This "rehabilitation" would have disastrous consequences for Applied, is contrary to the Conservation Order's goals, inconsistent with the Commissioner's repeated acknowledgments that CIC is financially fully able to conduct its insurance business, is arbitrary, capricious, and lacks any reasonable basis or legitimate regulatory purpose, and is an abuse of the Commissioner's power without any due process to Applied.

85.     Defendants' demands have become even more extreme and detached from the Conservation Order since the initial "rehabilitation" plan, seeking to impose punitive requirements on Applied.  In particular, the plan would end Defendant's conservation and control of CIC only if CIC and Applied agree to resolve all claims—*existing and potential*—involving workers' compensation insurance programs (primarily EquityComp®) that included CIC workers' compensation insurance policies.

86.     This demand from Defendants ignores the necessarily divergent facts and circumstances involved in each private litigation, would reward frivolous litigation by plaintiff policyholders, and would undermine multiple court decisions—including decisions by this Court—that have already found no merit to those plaintiffs' claims, including three failed federal class actions and a number of arbitration and lawsuit wins by Applied and CIC.

87.     Applied has found no precedent or possible regulatory purpose for such an outrageous demand, nor any precedent or possible regulatory purpose that Defendants can make this outrageous demand of a non-conserved, and indeed out-of-state party like Applied.

88.     There are currently somewhere around 40 pending litigations involving Applied relating to EquityComp® in California and other states, which involve at least 16 different counsel representing different plaintiffs, and feature various legal issues, factual allegations, and defenses.

89.     One such lawsuit is the *Roadrunner* case referenced above (the "*Roadrunner*" case). In *Roadrunner*, the plaintiff sought to avoid paying both the filed and approved rate charges for its CIC workers compensation policies and the amounts due under Applied's EquityComp® that included the CIC policies.  The case went to trial without a jury in October 2019.  On November 12, 2019, the court issued a "Statement of Intended Decision" denying the plaintiffs' claims and holding that Applied and the other defendants *were entitled to a judgment of $340,419 on their cross-claims*. No further proceedings have occurred in the *Roadrunner* case after the Ventura court was advised of the November 4 Conservation Order.

90.     Applied also achieved a complete victory in *Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, a putative class action before the Honorable William B. Shubb of this Court.  As stated above, in reviewing the EquityComp® program, Judge Shubb found no evidence of an attempt to conceal information about the program or its operation from anyone, including state regulators.  The Court subsequently denied the plaintiffs' motion for class certification.  One of the named plaintiffs, Pet Food Express, filed a motion for summary judgment, relying on the Commissioner's *Shasta Linen* administrative decision and arguing the profit-sharing agreement under the program was illegal and void, entitling Pet Food to restitution under the UCL.  CIC, Applied and other affiliates filed a cross-motion for summary judgment that Pet Food had no claim because it could show no actual loss.  The Court denied Pet Food's motion, finding the EquityComp® program and its profit-sharing component in particular were *not* void or illegal just because it was not filed with CDI, and noting the Court's "disagreement with the Commissioner" on that point.  The Court granted Applied's motion and awarded judgment to Applied and its co-defendants.

91.     Defendants' demand that Applied promptly settle dozens of lawsuits involving distinct factual and legal issues, including where Applied is presently entitled to recovery from the opposing parties, and in which numerous other parties are named as defendants, as a condition of lifting the conservatorship exceeds his authority and is completely unfounded, arbitrary, and prejudicial.  It also appears to be without precedent or basis in the California Insurance Code.  In

1  many cases, Applied and its co-defendants have already made reasonable efforts to settle the

2  litigations, which have been rejected by those plaintiffs with meritless demands.

3      92.    Apart from the inherent coercion involved in Defendants' demand, Defendants

4  cannot possibly require Applied to settle liabilities that may not exist, are shared between Applied

5  and other defendants, or may not be Applied's responsibility at all.

6      93.    In response to Defendants' unreasonable demands and consistent

7  mischaracterizations in public and private concerning, among other things, the EquityComp®

8  litigations and the Conservation Order, CIC and Applied have made public comments critical of

9  Defendants' tactics and judgment.

10     94.    On October 21, 2019, Applied's General Counsel Jeffrey Silver issued this statement

11 in an Applied press release criticizing CDI's conduct with respect to the Form A submissions:

12          We respect that the California Department of Insurance had a right
            to decide on our application, and we wish they had done so, one way
13          or the other. Five other state and federal regulators did, and by the
            way all of them approved the deal, but after six months California
14          still could not complete its homework.

15

16     95.    After the Commissioner placed CIC in conservatorship, Silver made the following

17 public statements criticizing Defendants' actions on or about November 4, 2019:

18     •  "The CDI has acted with an unprecedented, unnecessary regulatory overreach," and
19     •  "It is bad news for insurers in the state and for the citizens who will pay, ultimately, for
          the legal defense of this illogical, vindictive action."
20

21     96.    If Applied were to accede to Defendants' unwarranted demand and try to settle the

22 dozens of pending litigations and arbitrations in which it is involved, it would lead to absurd and

23 detrimental results.  For example, Applied would have to settle the *Roadrunner* case, which is

24 technically still pending after the bench trial and the court's November 12 "Statement of Intended

25 Decision" denying the plaintiffs' claims and proposing judgment to Applied and the other

26 defendants on cross-claims in the amount of $340,419.  Forcing a settlement in the face of a trial

27 win and favorable judgment is absurd and prejudicial both to CIC, but especially to Applied and

28 ARS and the other defendants who are not subject to the Conservation Order.

1    97.    Defendants' rehabilitation plan would require Applied to settle similar cases that

2    Applied and its co-defendants would likely win on the basis of the *Roadrunner* precedent and the

3    decisions issued by this Court.  Defendants' indisputable knowledge of this impossible result reveals

4    his true intent to decimate Plaintiffs' business by prolonging the unwarranted conservatorship and

5    using their power over CIC to inflict harm on Applied.

6    98.    *Stovall's Inn v. Applied Underwriters, Inc., et al.*, JAMS arbitration No. 120005573,

7    is another example where Defendants' unreasonable demand would reward frivolous claims and

8    force Applied and its co-defendants to give up substantive rights.  In that arbitration, the claimant

9    has demanded that it be excused from paying insurance premiums owed to CIC and has demanded

10   over $9 million in purported damages because of alleged overpayment of $1.3 million in premium.

11   These types of claims have been soundly rejected in other arbitrations.  Stovall's refusal to pay the

12   premiums under its CIC policies is also directly contrary to the CDI's own decisions and precedent

13   upholding the enforceability of those workers' compensation policies.  But Defendants' proposal to

14   resolve the conservatorship would require Applied to settle Stovall's matter and accept a less

15   favorable result than Applied otherwise could obtain if the matter were decided on its merits.

16   99.    The same is true for numerous other cases in which other plaintiffs are claiming

17   damages based on theories that have been soundly rejected by the Commissioner.  For example, in

18   *Charter Oak Oil Co., Inc. v. Applied Underwriters, Inc., et al.*, in the United States District Court,

19   District of Connecticut, the plaintiff is demanding that it be excused from paying filed and approved

20   insurance rates for CIC, asking for essentially free insurance.  As alluded to above, two California

21   Insurance Commissioners in at least five administrative matters have written detailed opinions

22   holding CIC policyholders are bound to pay the CIC policies' premiums even if other parts of the

23   workers' compensation insurance programs offered by Applied are voided.

24   100.   Requiring Applied to settle actions where the plaintiffs are seeking to avoid paying

25   filed and approved rates for their workers' compensation policies serves no legitimate regulatory

26   purpose because it conflicts with administrative law precedents requiring payment of filed rates.

27   Defendants' position also is inconsistent with its stated goals of "conserving" CIC because it is an

28

1   invitation for additional and damaging litigation against the company the CDI is supposed to be

2   conserving.

3       101.   Defendants' demand violates Plaintiffs' irrevocable due process rights to pursue their

4   defenses based on reasoning supported by the *Roadrunner* case, the administrative court decisions

5   enforcing filed rates, and the Filed Rate Doctrine.  Defendants should not be permitted to improperly

6   wield the weight of the Commissioner's authority to force Plaintiffs into unfavorable settlements

7   with private plaintiffs.

8       102.   Despite Plaintiffs' repeated and good faith attempts to address Defendants' concerns

9   and put an end the conservation of CIC and the ongoing harms it is causing to CIC and Plaintiffs,

10  CIC was forced to file a motion to vacate the Conservatorship in San Mateo Superior Court on

11  January 21, 2020 ("Motion to Vacate Conservatorship").  CIC originally noticed the Motion to

12  Vacate Conservatorship for February 20, 2020, but CIC acquiesced to the Commissioner's second

13  request for a continuance.  The court then *sua sponte* continued the hearing further in order to rule

14  first on several motions to seal filed by CIC and the Commissioner.  Then, due to COVID-19 court

15  closures, the hearing date was vacated entirely and was not re-noticed until August 6, 2020.  For

16  over six months CIC remained in conservation limbo with no ability to challenge the conservation,

17  and Applied and ARS remained unable to service new CIC policies.

18      103.   Finally, the Superior Court heard the Motion to Vacate Conservatorship on August

19  6, 2020.  The Superior Court entered an Order denying the Motion to Vacate Conservatorship

20  ("Denial Order") without the full hearing required by Insurance Code § 1012 and as a matter of due

21  process, and without having made any of the findings necessary to determine whether, under

22  Insurance Code §§ 1012 and 1011(c), the conditions for the Conservation Order continue to exist or

23  have been removed.

24      104.   Even before the Superior Court could hear CIC's Motion to Vacate Conservatorship,

25  and while the parties were still engaged in what were supposed to be good faith negotiations, the

26  Commissioner began filing motions threatening to draw up and release a non-consensual

27  "rehabilitation" plan.  On July 6, 2020, the Commissioner filed a motion seeking an order setting

28

procedures for court approval of such a Plan.  On July 30, the Court granted the motion and entered the Commissioner's order verbatim (the "Rehabilitation Plan Order").

105.    .   The Rehabilitation Plan Order allowed the Commissioner to issue a broad-sweeping written notice to all CIC policyholders and other third parties and members of the public of the Commissioner's Rehabilitation Plan, *before* the Superior Court has reviewed that plan, let alone approved its provisions, even preliminarily.

106.    On October 2, 2020, CIC filed a writ of mandate with the Court of Appeal for the First District of California seeking writ review of both the Denial Order and the Rehabilitation Plan Order as clear error as a matter of law and an abuse of the Superior Court's discretion.  On October 5, 2020, the Court of Appeal ordered preliminary briefing from the Commissioner on the issues raised in the writ.

**G.     Defendants' Filing and Publication of a Non-Consensual Rehabilitation Plan for CIC.**

107.    On October 19. 2020, the Commissioner filed an application for approval of a non-consensual rehabilitation plan in San Mateo County Superior Court (the "Rehabilitation Plan").

108.    The Commissioner's application consisted of the Rehabilitation Plan, a legal memorandum, declarations from two CDI employees, and the declaration of Larry J. Lichtenegger, a plaintiffs' attorney with a lengthy history of filing lawsuits against CIC and Applied.

109.    The Commissioner's application acknowledges that "CIC's financial status has remained stable" and that "CIC's AM Best credit rating remains at its pre-conservation A (Excellent) level."

110.     However, the Commissioner dedicated substantial portions of the memorandum and declarations contained within his application to repeating unfounded attacks on CIC and Plaintiffs regarding the EquityComp® program.

111.    The Commissioner's unfounded attacks on CIC and Plaintiffs in his application, publicly disseminated with the imprimatur of the California Department of Insurance, will only serve to further injure Plaintiffs' business, reputation, and goodwill.

112. The Rehabilitation Plan itself contains draconian terms that would cause Plaintiffs millions of dollars in losses. Central to the Rehabilitation Plan is a requirement that "CIC's book of California business" be transferred and reinsured "to another California-admitted insurer."

113. "CIC's book of California business" consists of valid and binding insurance agreements between CIC and its policyholders. These agreements contemplate the provision of insurance services in exchange for the payment of premiums. By forcing the transfer of CIC's California business to another insurer, the Commissioner would cause Plaintiffs to lose millions of dollars in anticipated revenue from those agreements.

114. The Rehabilitation Plan also requires the resolution of approximately 50 separate "pending" legal proceedings regarding the EquityComp® program—as well as any unidentified and unquantified "expected" legal proceedings—on terms dictated by the Commissioner.

115. The settlement requirements of the Rehabilitation Plan disregard this Court's 2019 rulings in *Shasta Linen Supply* and *Pet Food Express* rejecting policyholders' claims against the EquityComp® RPA. Moreover, the settlement requirements purport to extend to legal proceedings that involve Plaintiffs but not CIC.

116. Accordingly, the Rehabilitation Plan contemplates that Plaintiffs, over whom the San Mateo County Superior Court lacks jurisdiction, be required to settle pending proceedings without due process.

117. In some proceedings implicated by the Rehabilitation Plan, Applied is in fact owed money. Under the terms of the Rehabilitation Plan, then, Applied would be forced to relinquish its right to those funds and instead pay out "restitution" according to a formula dictated by the Commissioner.

**H.      Defendants' Actions Have Caused and Are Causing Irreparable Harm to Plaintiffs.**

118. The considerable harm to Plaintiffs' business and future prospects from Defendants' actions, including the Conservation Order, conservatorship, and Rehabilitation Plan, far outweigh any benefits thereof, particularly given the fact the Commissioner has not (and cannot) place Plaintiffs in conservatorship but continues to inflict harm on Plaintiffs with CDI's actions.

119.    Fueled by Defendants' unlawful actions and bad faith campaign, there is significant confusion in the market regarding Plaintiffs' and CIC's operations, including the fact that brokers, potential clients, and policyholders have wrongly assumed the conservation of CIC was financially motivated and thereby negatively reflects on both Applied and CIC.  This reputational damage continues and compounds each day the Conservation Order stays in place and is now further exacerbated by the Rehabilitation Plan.

120.    Since the Conservation Order was entered on November 4, CIC's operations have been subject to significant confusion in the marketplace, causing harm to Plaintiffs.  And Defendants have admitted in correspondence that the Conservatorship already has created "adverse consequences to CIC…."  As discussed, these adverse consequences on CIC directly negatively impact Plaintiffs' financial well-being and business reputation.

121.    Brokers representing insureds and potential insureds of CIC have called CIC seeking information about its status and expressing concern about the conservatorship's impact, and whether there is a financial concern about CIC and Plaintiffs.  Employees are confused as to their role and the future at Applied and ARS.  Policyholders have expressed concern and confusion about their Policies and coverages with CIC.  Plaintiffs' and CIC's reputations are severely damaged every day the conservatorship is in place and with the Commissioner's ongoing campaign to harm them, now including through the punitive Rehabilitation Plan.

122.    Applied has also been harmed due to the fact that CIC's affiliated insurers, which are also not subject to the Commissioner's authority, are part of a Reinsurance Pooling Agreement with CIC.  Any downgrade to CIC's AM Best "A" rating due to conservatorship concerns could result in a downgrade for the entire pool, rendering it impossible for CIC's affiliated insurers to operate and compete in the market, with further reputational harm for Plaintiffs.

123.    This risk is not just theoretical.  AM Best stated on November 13, 2019 that its rating of CIC and its affiliates are "under review with negative implications," and that it is "AM Best's intent to complete a comprehensive review of the groups' balance sheet strength, operating performance, business profile, and enterprise risk management over the near term and to resolve the current under review with negative implications status once all regulatory disputes are resolved."

124.   In other words, CIC's A credit rating is in jeopardy because of the unjustified conservatorship and Rehabilitation Plan, which threatens even more harm to Plaintiffs.   As a practical matter, the appointment of a conservator (and now the filed plan) creates the false impression in the marketplace that the Commissioner's concerns about CIC are financial when they are not, eroding confidence in CIC, and clouding future prospects.   Reinsurance is necessary for the affiliated companies to operate and cannot reasonably be expeditiously replaced if cancelled.   On December 2, 2019, State National Insurance Company ("State National"), with whom CIC has a reinsurance relationship through the Reinsurance Pooling Agreement, notified CIC that the Conservation Order raised "significant concern," despite being informed it was unrelated to CIC's financial condition. State National also expressed concern about the effect of the Order on the AM Best rating for CIC and its affiliates, and informed CIC the matter was now under review by State National's Security Committee.   Thus, CIC's reinsurance contracts and future prospects are at risk from the false impression that CIC is under financial strain, which further depletes Plaintiffs' revenues and business.

125.   As an example of irreparable harm to future prospects, when CIC seeks to get a new Certificate of Authority or purchase another insurance company, CIC (like any insurance company) must complete a Uniform Certificate of Authority Application that includes a Biographical Affidavit from all company directors and officers.   The forms ask whether the company has ever been subject to judicial, administrative, regulatory or disciplinary actions, specifically including conservatorship, and requires a full explanation of any such actions.   As Defendants are well aware, this improper conservatorship is something CIC will now have to disclose in connection with any future expansion plans, damaging those prospects.   By damaging those prospects, Plaintiffs' reputations are also damaged.

126.   Plaintiffs are without an effective remedy to address this irreparable harm.   On September 15, 2020, the San Mateo Superior Court denied CIC's Motion to Vacate Conservatorship without making any factual or legal findings.   The Superior Court also set a briefing schedule for approval of a rehabilitation plan.   Defendants told Applied that if Applied did not "voluntarily" agree to their version of a rehabilitation plan for CIC, then the Commissioner would seek a court

order approving an even more draconian and harmful version of the plan.  This is the epitome of bad faith and abuse of power, and Defendants have now followed through on their threat with the filing and publication of the Rehabilitation Plan.

**FIRST CAUSE OF ACTION**

**Violation of Plaintiffs' Rights to Due Process Pursuant to the Fourteenth Amendment to the Constitution of the United States; 42 U.S.C. § 1983 (Against All Defendants)**

127.    Plaintiffs incorporate all preceding paragraphs into this cause of action by reference as though fully restated herein.

128.    For the reasons set forth herein, Defendants deprived Plaintiffs of their goodwill, a property interest recognized by this Circuit, and thus Defendants were required to afford Plaintiffs due process of law.

129.    The Commissioner is an elected official of the State of California who at all relevant times has purported to act under color of state law and has exercised and continues to exercise his supervisory authority, duties, and responsibilities over all subordinates within California's Department of Insurance.

130.    Schnoll and Henley are appointed officials of the State of California who at all relevant times have purported to act under color of state law and have and continue to exercise their supervisory authority, duties, and responsibilities over subordinates within California's Department of Insurance.

131.    To the extent any conduct alleged in this Complaint was undertaken by a subordinate of Defendants, such conduct was taken with their actual and/or constructive knowledge thereof.

132.    Defendants, and their subordinates, have violated and continue to violate Plaintiffs' constitutional due process rights by, *inter alia*, obtaining a conservatorship over CIC without notice to CIC or Plaintiffs premised on knowingly false pretenses, misrepresentations, and omissions of material fact, which has interfered with Plaintiffs' property interests in their contracts with CIC and their ability to vindicate their rights and seek compensation due and owing to Plaintiffs, and by continuing to deprive Plaintiffs of their rights to due process by maintaining the conservatorship in

bad faith, failing to negotiate in good faith with CIC and Applied, and now through punitive terms in the Rehabilitation Plan.

133.   Defendants, and their subordinates, have also violated and continue to violate Plaintiffs' constitutional due process rights by demanding Applied agree to conditions in the Rehabilitation Plan pursuant to CIC's conservation despite the fact that Applied is not being conserved nor stands in a corporate familial relationship with CIC, nor does the Commissioner have authority over Applied, which is not a California corporation and does not transact insurance within California.

134.   As a direct and proximate result of Defendant's actions, inactions, and failures, Plaintiffs have been and are still being deprived of their constitutional right to due process of law.

**SECOND CAUSE OF ACTION**
**Violation of Plaintiffs' Rights to Equal Protection Pursuant to the Fourteenth**
**Amendment to the Constitution of the United States; 42 U.S.C. § 1983**
**(Against All Defendants)**

135.   Plaintiffs incorporate all preceding paragraphs into this cause of action by reference as though fully restated herein.

136.   The Commissioner is an elected official of the State of California who at all relevant times has purported to act under color of state law and has and continues to exercise his supervisory authority, duties, and responsibilities over all subordinates within California's Department of Insurance.

137.   Schnoll and Henley are appointed officials of the State of California who at all relevant times have purported to act under color of state law and have and continue to exercise their supervisory authority, duties, and responsibilities over subordinates within California's Department of Insurance.

138.   To the extent any conduct alleged in this complaint was undertaken by a subordinate of Defendants, such conduct was taken with their actual and/or constructive knowledge thereof.

139.   Defendants, and their subordinates, have violated and continue to violate Plaintiffs' constitutional equal protection rights by, *inter alia*, obtaining a conservatorship over CIC without notice to CIC or Plaintiffs premised upon knowingly false pretenses, misrepresentations, and

omissions of material fact, that has interfered with Plaintiffs' property interests in their contracts with CIC and their ability to maintain litigation efforts to vindicate their rights and seek compensation due and owing to Plaintiffs, and by continuing to deprive Plaintiffs of their rights to due process by maintaining the conservatorship in bad faith and failing to negotiate in good faith with CIC and Applied, and now through punitive terms set forth in the Rehabilitation Plan.

140.    Defendants, and their subordinates, have also violated and continue to violate Plaintiffs' constitutional equal protection rights by demanding Applied agree to conditions in CIC's Rehabilitation Plan despite the fact that Applied is not being conserved nor stands in a corporate familial relationship with CIC, nor does the Commissioner have authority over Applied, which is not a California corporation and does not transact insurance within California.

141.    Upon information and belief, the Commissioner does not treat similarly-situated insurance companies, or their managers or underwriting agents, in the same way.  The intent of Insurance Code § 1011(c) is to prevent companies from removing assets from California via merger in cases of insolvency, not to force insurance companies, or their managers or underwriting agents, to resolve separate litigation or other matters collateral to the reasons the conservatorship was imposed.

142.    As a direct and proximate result of Defendants' actions, inactions, and failures, Plaintiffs have been and are still being deprived of their constitutional right to equal protection.

### THIRD CAUSE OF ACTION
**Declaratory Judgment that Defendant's Actions Constitute a Taking in Violation of the Fifth and Fourteenth Amendments of the United States Constitution
(Against All Defendants)**

143.    Plaintiffs incorporate all preceding paragraphs into this cause of action by reference as though fully restated herein.

144.    The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment, provides:  "nor shall private property be taken for public use, without just compensation."

145.    At all times relevant hereto, Plaintiff Applied had a property interest in contractual rights with CIC under the July 26, 2005 Management Services Agreement and Plaintiff ARS had a

1  property interest in contractual rights with CIC under the June 1, 2005 Underwriting Agent

2  Agreement.

3      146.    The Commissioner is an elected official of the State of California who at all relevant

4  times has purported to act under color of state law and has and continues to exercise his supervisory

5  authority, duties, and responsibilities over all subordinates within the California Department of

6  Insurance.

7      147.    Schnoll and Henley are appointed officials of the State of California who at all

8  relevant times have purported to act under color of state law and have and continue to exercise their

9  supervisory authority, duties, and responsibilities over subordinates within California's Department

10 of Insurance.

11     148.    To the extent any conduct alleged in this complaint was undertaken by a subordinate

12 of Defendants, such conduct was taken with their actual and/or constructive knowledge thereof.

13     149.    Defendants, and their subordinates, have effected an unlawful taking of Plaintiffs'

14 property interests in their contractual rights with CIC by obtaining a conservatorship over CIC in

15 violation of law and by maintaining the conservatorship in bad faith to the detriment of Plaintiffs'

16 rights.  Furthermore, Defendants have used and are using the Commissioner's conservatorship and

17 control over CIC to coerce Applied into agreeing to a Rehabilitation Plan, which would require

18 Plaintiffs to forego economically valuable rights to defend pending and future litigation, and deprive

19 Plaintiffs of the value of their contractual interests with CIC, which depend on CIC's continuation

20 of its sale and servicing of insurance policies in California.

21     150.    Defendants' actions have directly and adversely impacted Plaintiffs.  Defendants'

22 interference with CIC's reputation in the marketplace through his conservatorship has reduced

23 CIC's policy renewals and overall business, reducing the revenue flowing to Plaintiffs and

24 interfering with Plaintiffs' reasonable investment-backed expectations of their contractual rights

25 with CIC.

26     151.    Defendants have not paid just compensation to Plaintiffs for Defendants' actions.

27     152.    Plaintiffs claim that these acts are contrary to law and seek a declaration of their

28 rights with regard to this controversy.

**FOURTH CAUSE OF ACTION**
**Equitable Relief from a Taking in Violation of the Fifth and Fourteenth Amendments of the United States Constitution; 42 U.S.C. § 1983**
**(Against All Defendants)**

153.    Plaintiffs incorporate all preceding paragraphs into this cause of action by reference as though fully restated herein.

154.    In light of the United States Supreme Court decision *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019), Plaintiffs are entitled to bring constitutional claims under § 1983 without first bringing a state lawsuit, even when state court actions addressing the underlying behavior may be available.

155.    Without relief from Defendants' unlawful taking of Plaintiffs' property interest in their contractual rights with CIC, Plaintiffs will continue to suffer economic harm from Defendants' actions.

156.    Plaintiffs are entitled to injunctive relief enjoining Defendants from continuing the Commissioner's bad-faith conservatorship.

**FIFTH CAUSE OF ACTION**
**First Amendment Retaliation; 42 U.S.C. § 1983**
**(Against All Defendants)**

157.    Plaintiffs incorporate all preceding paragraphs into this cause of action by reference as though fully restated herein.

158.    The conduct of Defendants deprived Plaintiffs of their First Amendment rights to criticize public officials in the press and Plaintiffs' First Amendment right petition the government, exercised through its access to the courts.

159.    As described in more detail elsewhere in this complaint, Defendants violated Plaintiffs' rights by retaliating against Plaintiffs for accessing the federal courts to dispute Defendants' interpretation of the insurance code as it applied to the RPA and for criticizing in the press Defendants' treatment of Applied.

160.    Defendants' conduct, as set forth above, was the direct and proximate cause of severe and ongoing injury to Plaintiffs' business and goodwill, as stated elsewhere in this complaint.

161.    Given the ongoing nature of Defendants' conduct, Plaintiffs seek injunctive relief.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, in connection with the preceding paragraphs, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and award the following relief:

A.      An Order declaring the Commissioner's actions, as alleged, violate Plaintiffs' rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution;

B.      An Order declaring the Commissioner's actions, as alleged, constitute an unlawful taking of Plaintiffs' property interests in violation of the Fifth and Fourteenth Amendments to the United States Constitution;

C.      An Order vacating the Commissioner's conservatorship of CIC and enjoining the Commissioner from continuing to hold CIC under conservation;

D.      An Order enjoining Defendants from continuing to retaliate against Plaintiffs for exercising their First Amendment rights to speech and petition;

E.      An Order for reasonable attorneys' fees under 42 U.S.C. § 1988(b); and

F.      Such other relief as the Court may deem just and appropriate.

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs demand a jury trial on all issues so triable.

3

Respectfully submitted,

4

5

By:  _/s/ Maxwell V. Pritt_
6
Maxwell V. Pritt (SBN 253155)
mpritt@bsfllp.com
7
Joshua I. Schiller (SBN 330653)
jischiller@bsfllp.com
8
Beko O. Reblitz-Richardson (SBN 238027)
brichardson@bsfllp.com
9
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
10
San Francisco, CA 94104
Telephone: (415) 293-6800
11
Facsimile: (415) 293-6899

12
Reed D. Forbush (*pro hac vice forthcoming*)
rforbush@bsfllp.com
13
BOIES SCHILLER FLEXNER LLP
333 Main Street
14
Armonk, NY 10504
Telephone: (914) 749-8200
15
Facsimile: (914) 749-8300

16
*Counsel for Plaintiffs Applied Underwriters, Inc. and Applied Risk Services, Inc.*

17

18

19

20

21

22

23

24

25

26

27

28