1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10                               ----oo0oo----

11

12   APPLIED UNDERWRITERS, INC., a        No. 2:20-cv-02096 WBS AC
     Nebraska corporation; and
13   APPLIED RISK SERVICES, INC., a
     Nebraska Corporation,
14                                         ORDER RE: DEFENDANTS' MOTION
                                           TO DISMISS
15              Plaintiffs,

16        v.

17   INSURANCE COMMISSIONER OF THE
     STATE OF CALIFORNIA RICARDO
18   LARA, in his official
     Capacity; et al.,
19
                Defendants.
20

21

22                               ----oo0oo----

23          Plaintiffs Applied Underwriters, Inc. ("Applied") and

     Applied Risk Services, Inc. ("ARS") (collectively, "plaintiffs")

24   brought this action against defendants Ricardo Lara, Insurance

25   Commissioner of the State of California ("Lara" or

26   "Commissioner"), and Kenneth Schnoll and Bryant Henley,

27   California Department of Insurance Deputy Commissioners

28
                                     1

1  (collectively, "defendants"), in response to defendants'

2  imposition of a conservation over non-party California Insurance

3  Company ("CIC") in San Mateo Superior Court in November 2019 (the

4  "Conservation Proceeding").  (See First Amended Complaint ("FAC")

5  (Docket No. 26).)  Plaintiffs--affiliates of CIC--allege that

6  defendants' actions leading up to and including the Conservation

7  violated their rights to equal protection and due process under

8  the Fourteenth Amendment, as well as their First Amendment right

9  to criticize officials in the press and petition the government,

10  in violation of 42 U.S.C. § 1983.  (FAC ¶¶ 135-90.)  Plaintiffs

11  further allege that defendants' actions constituted unlawful

12  takings in violation of the Fifth and Fourteenth Amendments, and

13  levy an as-applied challenge against California Insurance Code

14  § 1011(c) under the Dormant Commerce Clause of the United States

15  Constitution, Art. I, § 8, cl. 3.  (Id.)

16      Defendants have moved to dismiss plaintiffs' complaint

17  for lack of subject matter jurisdiction and for failure to state

18  a claim upon which relief may be granted.  (See Defs.' Mot. to

19  Dismiss ("Mot. to Dismiss") (Docket No. 35).)

20  I.   Factual and Procedural Background

21      Plaintiffs write workers' compensation insurance

22  through multiple insurance companies in all 50 states.  (FAC

23  ¶ 2.)  CIC is the largest of those companies.  (Id.)  Plaintiffs

24  and CIC are closely related companies.  All three are subject to

25  common management and control: Steven Menzies indirectly owns CIC

26  and serves as its CEO, and is the President of CIC, Applied, and

27  ARS.  (See FAC ¶¶ 48, 51, 52; Defs.' Req. for Judicial Notice,

28  Exs. 8, 9 (Docket No. 36.)  The three entities also share the

2

same Secretary and General Counsel, Jeffrey Silver.  (See id. at
Exs. 8, 9.)  According to the Nebraska Secretary of State's
website, Menzies and Silver serve as the sole directors of both
Applied and ARS, and Menzies serves as President and Treasurer
for both Applied and ARS.  (See id.)  Moreover, Applied and ARS'
operative agreements with CIC indicate that they remain subject
to CIC's supervision and control.  (See id. at Exs. 1, 2.)

The First Amended Complaint ("FAC") alleges that
Applied profits from CIC's operations by receiving administrative
fees from CIC clients--which Applied charges as a percentage of
each client's payroll--pursuant to the CIC and Applied's
Management Services Agreement ("MSA").  (FAC ¶ 106.)  Plaintiffs
allege that ARS profits from its Underwriting Agent Agreement
("UAA") with CIC in a manner similar to Applied.  (Id. at ¶ 107.)

Plaintiffs allege that defendants have engaged in a
bad-faith campaign of unlawful activity aimed at CIC, beginning
in 2019, when Menzies (at the time an indirect owner of 11.5% of
CIC's shares) sought to purchase Berkshire Hathaway's
("Berkshire") controlling interest in CIC.  (See FAC ¶¶ 48-63.)
In January 2019, Menzies entered into an agreement with Berkshire
to purchase the company by September 30th, or else Menzies would
be subject to a $50 million "breakup fee" (the "Berkshire/Menzies
Agreement").  (See id.)  Though Applied, Menzies, and CIC
informed defendants of the details of the proposed sale, due to
additional requests for information from the California
Department of Insurance ("CDI"), Menzies had to submit new "Form
A" filings multiple times between April and September, and CDI
ultimately did not rule on Menzies' pending application prior to

1    the September 30, 2019 deadline.  (<u>Id.</u> at ¶¶ 53-63.)

2          In response, Applied, CIC, and Menzies created a new

3    entity in New Mexico, "CIC II," and sought to merge CIC with CIC

4    II so that the transaction could be completed under the

5    supervision of New Mexico's Insurance Department rather than CDI.

6    (FAC ¶¶ 64-66.)  This process culminated in a conference call and

7    Form A approval hearing on October 9, 2019, in which regulators

8    from New Mexico, Texas, and California (including CDI)

9    participated and attended.  (<u>Id.</u>)  According to plaintiffs, CDI

10   did not object to the merger or the sale's consummation during

11   the hearing, during which New Mexico's Superintendent of

12   Insurance, Superintendent Franchini, approved the merger.  (<u>Id.</u>)

13   Rather, plaintiffs allege that CDI attorneys told Superintendent

14   Franchini that the "proposed merger presented no risks to

15   California policyholders."  (<u>Id.</u>)  Following Superintendent

16   Franchini's order approving the merger, Berkshire informed the

17   New Mexico Department of Insurance that, based on the lack of

18   objection at the Form A approval hearing, it planned to proceed

19   with the closing scheduled for October 10, 2019.[1]  (<u>Id.</u> at ¶ 69.)

20         On October 18, 2019, defendants informed CIC that, due

21   to CIC's merger into CIC II, CIC's California-issued Certificate

22   of Insurance--which authorizes CIC to sell insurance in the

23   state--would be extinguished by operation of law and that the

24   surviving entity would not be qualified to transact insurance in

25   California.  (<u>Id.</u> at ¶ 75.)  Though plaintiffs allege that CIC

26   ──────────────
27         [1]   Though the FAC does not explicitly state that Berkshire
     and Menzies completed the sale of CIC, paragraph 31 indicates
     that CIC has been "wholly owned by Steven Menzies" since October
28   10, 2019.  (FAC ¶ 31.)

voluntarily refrained from taking any further action relating to the merger, on November 4, 2019, the Commissioner filed an ex parte application in San Mateo County Superior Court (the "Superior Court"), requesting that the court place CIC in conservation, with Lara as conservator, because CIC had attempted to effect a merger without regulatory approval in violation of California Insurance Code § 1011.  (Id. at ¶¶ 79, 81, 101.)  The Superior Court granted the Commissioner's request.  (See Defs.' Req. for Judicial Notice, Ex. 7 (the "Conservation Order").)  As a result, defendants have exercised control over the assets and operations of CIC since November 4, 2019, and CIC has been unable to transfer its assets to CIC II.  (Id.; FAC ¶ 92.)

CIC has posed multiple challenges to the Conservation Proceeding in state court, arguing that the Commissioner acted arbitrarily and capriciously, that his basis for imposing the Conservation was pretextual, and that the Proceeding violates CIC's constitutional rights.  First, CIC filed an application with the Superior Court to vacate the conservatorship.  (Defs.' Req. for Judicial Notice, Exs. 10, 13.)  After the Superior Court denied the application, CIC filed an application for interlocutory appellate review with the California Court of Appeal, which was also denied.  (See id., Exs. 11, 15).

Defendants then filed an application for approval of a non-consensual rehabilitation plan in Superior Court (the "Proposed Rehabilitation Plan").  (FAC at ¶ 102.)  This Proposed Rehabilitation Plan would (1) require CIC to transfer and reinsure its book of California business to another California-admitted insurer, and (2) require CIC and plaintiffs to settle

5

1   over 40 separate pending legal proceedings regarding CIC and

2   plaintiffs' "EquityComp" program--a loss sensitive workers'

3   compensation program that has been the subject of dozens of

4   lawsuits involving plaintiffs and CIC--by paying claimants in the

5   pending legal proceedings any of three restitution amounts that

6   the claimant selects.  (Id. at ¶¶ 38-47; 104-110.)  The Proposed

7   Rehabilitation Plan would also limit the amount CIC and

8   plaintiffs may collect under the policies they issue or service.

9   (Id.)  Plaintiffs allege that these portions of the Proposed

10  Rehabilitation Plan constitute an unconstitutional transfer of

11  contract and other property rights from one set of private

12  litigants to another, depriving CIC and plaintiffs of their due

13  process right to litigate the claims.  (Id.)

14          On July 30, 2020, the Superior Court set a briefing

15  schedule and hearing date, and established procedures for

16  opposing the Commissioner's application for an order approving

17  the Proposed Rehabilitation Plan.  (See Defs.' Req. for Judicial

18  Notice, Ex. 4 (the "Procedural Order").)  The Procedural Order

19  expressly invites plaintiffs and other affiliates of CIC to

20  present their objections to the Proposed Rehabilitation Plan in

21  writing and orally at the scheduled hearing.  (See id.)

22          Following the Superior Court's issuance of the

23  Procedural Order, plaintiffs filed this suit, requesting that

24  this court intervene in the ongoing state court proceeding by

25  "vacating the Commissioner's conservatorship of CIC" and

26  "enjoining the Commissioner from continuing to hold CIC under

27  conservation."  (See Compl., Prayer for Relief ¶ C (Docket No.

28  1).)  While plaintiffs have since amended their complaint, the

6

1    FAC still requests that this court effectively enjoin the ongoing

2    state court proceeding by directing the Commissioner to terminate

3    the Conservation and withdraw the Proposed Rehabilitation Plan.

4    (See FAC, Prayer for Relief ¶¶ C-G.)

5         As of the date of this Order, the Superior Court has

6    not yet approved or denied the Proposed Rehabilitation Plan; a

7    hearing on the Commissioner's application is scheduled for April

8    15, 2021.  (See Defs.' Req. for Judicial Notice, Ex. 5.)

9    II.  Discussion

10        Federal Rule of Civil Procedure 12(b)(1) authorizes

11   dismissal for lack of subject matter jurisdiction.  Motions to

12   dismiss based on exclusive in rem jurisdiction of a state court

13   are properly analyzed under Rule 12(b)(1).  See Chapman v.

14   Deutsche Bank Nat. Trust Co., 651 F.3d 1039, 1043 (9th Cir.

15   2011).  A motion to dismiss on Younger[2] abstention grounds is

16   also properly brought under Rule 12(b)(1).  Steel Co. v. Citizens

17   for a Better Env't, 523 U.S. 83, 100 n.3 (1998) (treating Younger

18   abstention as jurisdictional); Washington v. Los Angeles Cnty.

19   Sheriff's Dep't, 833 F.3d 1048, 1058 (9th Cir. 2016) (recognizing

20   "a dismissal due to Younger abstention [is] similar to a

21   dismissal under Rule 12(b)(1)").

22        A.   Requests for Judicial Notice

23        Though a court generally may not consider material

24   outside the complaint on a motion to dismiss under Rule 12(b)(1),

25   the court may look beyond the pleadings "at documents

26   incorporated into the complaint by reference, and matters of

27

28        [2]   Younger v. Harris, 401 U.S. 37 (1971).

1   which a court may take judicial notice." _Tellabs, Inc. v. Makor_

2   _Issues & Rights, Ltd._, 551 U.S. 308, 322 (2007).

3        A defendant may seek to incorporate a document by

4   reference into the complaint "if the plaintiff refers extensively

5   to the document or the document forms the basis of the

6   plaintiff's claim." _United States v. Ritchie_, 342 F.3d 903, 907

7   (9th Cir. 2003).  "The court may treat such a document as 'part

8   of the complaint'" and "may assume that its contents are true for

9   purposes of a motion to dismiss," _Marder v. Lopez_, 450 F.3d 445,

10  448 (9th Cir. 2006) (emphases added), so long as such assumptions

11  do not only serve to dispute facts in the complaint.  _Khoja v._

12  _Orexigen Therapeutics, Inc._, 899 F.3d 988, 1003 (9th Cir. 2018).

13       Under Federal Rule of Evidence 201, a court may take

14  judicial notice of an adjudicative fact that is "not subject to

15  reasonable dispute because it: (1) is generally known within the

16  trial court's territorial jurisdiction; or (2) can be accurately

17  and readily determined from sources whose accuracy cannot

18  reasonably be questioned."  Fed. R. Evid. 201(b).  Accordingly, a

19  court may take judicial notice of matters of public record.

20  _Khoja_, 899 F.3d at 999.  Courts routinely take judicial notice of

21  documents on file in federal or state courts, _see, e.g., Harris_

22  _v. Cnty. of Orange_, 682 F.3d 1126, 1132 (9th Cir. 2012) (taking

23  judicial notice of declaration filed in prior litigation), and

24  information on government websites, _Gerritsen v. Warner Brothers_

25  _Entertainment Inc._, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015).

26       The court hereby takes judicial notice of Exhibits 1

27  and 2 to defendants' Request for Judicial Notice, the MSA and

28  UAA, under the incorporation-by-reference doctrine.  _See Ritchie_,

1  342 F.3d at 907.  Plaintiffs refer extensively to these documents

2  throughout the FAC, and they are central to the plaintiffs'

3  claims of injury.  (See FAC ¶¶ 106-108, 176.)

4        The court also takes judicial notice of Exhibit A to

5  Exhibit 3, and Exhibits 4, 5, 6, 7, 10, 11, 12, 13, 14, and 15 to

6  defendants' request for judicial notice.  Exhibit A to Exhibit 3

7  is a copy of the Proposed Rehabilitation Plan, and is judicially

8  noticeable both as a matter of public record and pursuant to the

9  incorporation by reference doctrine.  See Cnty. of Orange, 682

10  F.3d at 1132; Ritchie, 342 F.3d at 907.  The Superior Court's

11  Procedural Order, Order to Continue Certain Briefing Deadlines

12  for the Conservator's Rehabilitation Plan, Clerk's Notice of

13  Hearing, the Conservation Order, Order Denying Respondent's

14  Verified Application to Vacate the Conservation Order, Order

15  Denying Petition for Writ of Mandate, Memorandum of Points and

16  Authorities and Reply in Support of Application to Vacate the

17  Conservation Order, and Petition for Writ of Mandate (Exhibits 4,

18  5, 6, 7, 10, 11, 13, 14, and 15 to defendants' Request for

19  Judicial Notice, respectively) are all judicially noticeable on

20  the ground that they are matters of public record as documents on

21  file in the state court.  Cnty. of Orange, 682 F.3d at 1132.  The

22  court further notes that plaintiffs do not object to defendants'

23  request for Exhibits 5, 6, 7, 11, 13, 14, or 15.

24        The court further takes judicial notice of Exhibits 8

25  and 9 to defendants' Request for Judicial Notice, which are

26  business entity profiles for plaintiffs Applied and ARS,

27  retrieved from the Nebraska Secretary of State website, and thus

28  matters of public record not subject to reasonable dispute.  See

9

1  Gerritsen, 112 F. Supp. 3d at 1033.

2          Finally, plaintiffs request that the court take

3  judicial notice of defendants' Ex Parte Application for an Order

4  Appointing the Insurance Commissioner as Conservator and of the

5  Commissioner's Memorandum in Opposition to Respondent's

6  Application to Vacate Order Appointing Conservator.  (Pls.' Req.

7  for Judicial Notice, Exs. P2, P7 (Docket No. 44).)  The court

8  hereby takes notice of these documents on the ground that they

9  are matters of public record.  Cnty. of Orange, 682 F.3d at 1132.

10      B.   Prior Exclusive Jurisdiction

11         The "ancient and oft-repeated . . . doctrine of prior

12  exclusive jurisdiction" holds "that when a court of competent

13  jurisdiction has obtained possession, custody, or control of

14  particular property, that possession may not be disturbed by any

15  other court."  State Eng'r of State of Nev. v. S. Fork Band of

16  Te-Moak Tribe of W. Shoshone Indians of Nev., 339 F.3d 804, 809

17  (9th Cir. 2003) (quoting 14 Charles Alan Wright, Arthur R.

18  Miller, Edward H. Cooper, Federal Practice and Procedure § 3631,

19  at 8 (3d ed. 1998)).  "That is, when one court is exercising in

20  rem jurisdiction over a res, a second court will not assume in

21  rem jurisdiction over the same res."  Sexton v. NDEX West, LLC,

22  713 F.3d 533, 536 (9th Cir. 2013) (citations omitted).  "The

23  purpose of the rule is the maintenance of comity between courts;

24  such harmony is especially compromised by state and federal

25  judicial systems attempting to assert concurrent control over the

26  res upon which jurisdiction of each depends."  Id.

27         To determine whether prior exclusive jurisdiction

28  applies, the court first must evaluate the priority of the

1    actions.  <u>See</u> <u>Gustafson v. Bank of Am., N.A.</u>, Case No. 16cv1733

2    BTM (KSC), 2016 WL 7438326, at *6 (S.D. Cal. Dec. 27, 2016).

3    Second, the court must determine how to characterize the

4    concurrent actions.  <u>See</u> <u>Pascua v. OneWest Bank</u>, No. CV 16-00016

5    LEK-KSC, 2017 WL 424851, at *3 (D. Haw. Jan. 31, 2017) (citing

6    <u>Gustafson</u>, 2016 WL 7438326, at *6).  "If both of the pending

7    actions are <u>in rem</u> or <u>quasi in rem</u>, the prior exclusive

8    jurisdiction doctrine applies."  <u>Id.</u>

9         Here, the Conservation Proceeding clearly has priority,

10   as it was commenced almost a year before plaintiffs filed this

11   action.  (<u>See</u> FAC ¶ 81).  The court must therefore dismiss this

12   action if it determines that both actions are <u>in rem</u> or <u>quasi in</u>

13   <u>rem</u>.  <u>See</u> <u>Chapman</u>, 651 F.3d at 1044.

14        The question of whether an action is <u>in rem</u>, <u>quasi in</u>

15   <u>rem</u>, or <u>in personam</u> "turns on what, precisely, is at issue in the

16   state and federal court proceedings."  <u>Goncalves by and through</u>

17   <u>Goncalves v. Rady Childs. Hosp. San Diego</u>, 865 F.3d 1237, 1253

18   (9th Cir. 2017).  An action is <u>in rem</u> when it "determine[s]

19   interests in specific property as against the whole world."

20   <u>State Eng'r</u>, 339 F.3d at 811 (quoting In Rem, BLACK'S LAW

21   DICTIONARY (6th ed. 1990)).  "Under California law, a suit

22   proceeds <u>in rem</u> [only] where property is 'seized and sought to be

23   held for the satisfaction of an asserted charge against property

24   without regard to the title of individual claimants to the

25   property.'"  <u>Hanover Ins. Co. v. Fremont Bank</u>, 68 F. Supp. 3d

26   1085, 1109 (N.D. Cal. 2014) (quoting <u>Lee v. Silva</u>, 197 Cal. 364,

27   240 P. 1015, 1016 (1925)).  An action is <u>quasi in rem</u> when it is

28   brought "against the defendant[s] personally" but "the [parties']

1    interest[s] in the property ... serve[ ] as the basis of the

2    jurisdiction." State Eng'r, 339 F.3d at 811 (alterations in

3    original). "On the other hand, where a party initiates an action

4    merely to 'determine the personal rights and obligations of the

5    [parties],' the court asserts in personam jurisdiction." Hanover

6    Ins. Co., 68 F.Supp.3d at 1109 (quoting Pennoyer v. Neff, 95 U.S.

7    714, 727 (1877)).

8           The court's jurisdiction in the underlying suit may be

9    in rem or quasi in rem even if the property at issue was not

10   "actually seized under judicial process before a second suit

11   [was] instituted." Goncalves, 865 F.3d at 1254 (quoting United

12   States v. Bank of N.Y. & Tr. Co., 296 U.S. 463, 477 (1936)). The

13   doctrine "applies as well where suits are brought to marshal

14   assets, administer trusts, or liquidate estates, and in suits of

15   a similar nature, where, to give effect to its jurisdiction, the

16   court must control the property." Id. "When applying the

17   doctrine, courts should not 'exalt form over necessity,' but

18   instead should 'look behind the form of the action to the

19   gravamen of a complaint and the nature of the right sued on.'"

20   Chapman, 651 F.3d at 1044 (quoting State Eng'r, 339 F.3d at 810).

21          It cannot seriously be doubted that, here, the Superior

22   Court's jurisdiction over CIC is in rem. The Superior Court's

23   Order appointing the Commissioner as conservator of CIC, pursuant

24   to California Insurance Code § 1011(c), effectively seizes the

25   res--all property and assets of CIC--and vests full title and

26   control to the Commissioner, as conservator. (See Conservation

27   Order at ¶ 12); Hanover, 68 F. Supp. 3d at 1109. The

28   Conservation Order authorizes the Commissioner to take possession

12

of any and all assets of CIC, to maintain and invest any of those assets or funds according to his discretion, and to exercise all powers of the directors, officers, and managers of CIC. (Conservation Order at ¶¶ 11-14.)

Contrary to plaintiffs' contention, it makes no difference that the Conservation Order vests title to CIC and its assets in the Commissioner, rather than the court itself. (See Pls.' Opp'n at 44-45.)  In United States v. Bank of N.Y., the Supreme Court addressed the issue of prior exclusive jurisdiction in the context of a court-ordered liquidation of the Moscow Fire Insurance Company.  See Bank of N.Y., 296 U.S. at 471.  There, the state court had directed the state's superintendent of insurance to take possession of the Bank of N.Y.'s United States branches and "conserve those assets until its further order." Id.  Though the superintendent was a statutory liquidator, the Supreme Court held that that the proceeding was "essentially one in rem" because the superintendent "took possession under the direction of the court," "the fund was at all times subject to the court's control," and "the superintendent was protected by a sweeping injunction in the unimpeded liquidation of the sequestered property."  See id.

Likewise, here, the Commissioner--a statutory conservator--has taken title to CIC and its assets "under the direction" of the Superior Court.  (See Conservation Order.) Though the Commissioner may take possession of the property and conduct the business of CIC, he merely does so "as a minister of the superior court in its statutory responsibility to protect the public interest and conserve the rights of the creditors and

13

policyholders of the conservatee." In re Pac. Std. Life Ins. Co., 9 Cal. App. 4th 1197, 1201 (1992).  The Commissioner ultimately remains subject to the control of the Superior Court, who both grants him the authority to act and must find, after a full hearing, that the ground for the Conservation Order no longer exists or has been removed before the conservation may be lifted.  See Cal. Ins. Code § 1012; see also id. at § 1037(d) (requiring that the Commissioner, in his capacity as liquidator or conservator, obtain permission of the court prior to entering transactions for the sale or transfer of estate property exceeding $20,000 in fair market value).  The Commissioner is further protected by a "sweeping injunction" allowing him to proceed with the Conservation unimpeded by third parties, similar to the statutory liquidator in Bank of N.Y.  (See Conservation Order ¶ 17); Cal. Ins. Code § 1020(a) ("Upon the issuance of an order . . . under Section 1011 . . . the court shall issue such other injunctions or orders as may be deemed necessary to prevent . . . interference with the commissioner or the proceeding."); see also Garamendi v. Exec. Life, 17 Cal. App. 4th 504, 523 (2d Dist. 1993) (holding that the superior court's in rem jurisdiction under § 1020 extends to assets of third parties that have an "identity of interest" with an insolvent insurer).

Adjudicating plaintiffs' claims in this case would also require this court to assert in rem jurisdiction, or at the least, quasi in rem jurisdiction, over the res at issue, CIC and its assets.  Plaintiffs argue that the federal action cannot be classified as in rem because their operative complaint does not ask this court to "seize and control" any property.  (See Pls.'

14

1  Opp'n at 42.)   Rather, plaintiffs urge, the relief they seek is

2  directed "exclusively at defendants to remedy their

3  constitutional violations."   (See id.)

4          However, this argument takes an unduly narrow view of

5  the nature of the right plaintiffs have sued upon and the relief

6  they seek.   Binding precedent dictates that the court must "look

7  behind the form of the action to the gravamen of a complaint . .

8  . lest we exalt form over necessity."   See State Eng'r, 339 F.3d

9  at 810.   In Bank of N.Y., for instance, the Supreme Court held

10  that suits brought in federal court by the United States for

11  accounting and delivery of funds originally owned by several

12  insurance companies invoked the court's in rem jurisdiction

13  because they would "necessarily interfere with the jurisdiction

14  or control by the state court," which had placed the funds in the

15  hands of court-appointed receivers.   See Bank of N.Y., 296 U.S.

16  at 477-78.   Though the United States argued that it had brought

17  its suits in personam, the Court rejected this characterization,

18  concluding that "the object of the suits [was] to take the

19  property from the depositaries and from the control of the state

20  court, and to vest the property in the United States to the

21  exclusion of all those whose claims are being adjudicated in the

22  state proceedings."   Id. at 478.

23          Here, though plaintiffs nominally ask this court to

24  enter orders aimed at the Commissioner and his deputy

25  commissioners at the California Department of Insurance, it is

26  clear that their ultimate goal is similarly to "interfere with,"

27  or even terminate, the Conservation Proceeding.   Id.   Plaintiffs'

28  original complaint simply requested that this court "vacat[e] the

1    Commissioner's conservatorship of CIC."  (See Compl., Prayer for

2    Relief ¶ C.)  While plaintiffs have since amended their Prayer

3    for Relief, the operative complaint still seeks orders directing

4    the Commissioner to "take all necessary steps to end CIC's

5    conservatorship" and "enjoining the Commissioner from continuing

6    the conservation."  (See FAC, Prayer for Relief ¶ C.)  The

7    operative complaint also asks this court to order the

8    Commissioner to withdraw the Proposed Rehabilitation Plan (id. at

9    ¶¶ D-G), which was filed pursuant to an order of the Superior

10   Court and which the Superior Court is currently reviewing.

11          Therefore, though plaintiffs do not explicitly ask the

12   court to "seize" CIC or its assets from the Superior Court, they

13   do ask the court to issue orders that would "disturb" the state

14   court's control of CIC and its assets in a manner that would

15   amount to the assertion of in rem, or, at the least, quasi in rem

16   jurisdiction.[3]  See Bank of N.Y., 296 U.S. at 478; State Eng'r,

17   339 F.3d at 810 (holding that, although contempt action was

18   styled as an in personam action, there could "be no serious

19   dispute that [it] was brought to enforce a decree over a res"--

20   the Humboldt River--and, therefore, adjudication by the federal

21

22          [3]  The fact that plaintiffs also seek declaratory relief
     does not alter the court's analysis.  Though plaintiffs seek
23   declarations that the Commissioner has acted unconstitutionally,
     the gravamen of their complaint is clearly to bring an end to the
24   Conservation Proceeding currently pending in Superior Court.  See
     Pascua v. OneWest Bank, No. CV 16-00016 LEK-KSC, 2017 WL 424851,
25   at *9 (D. Haw. Jan. 31, 2017) (noting that "[a]lthough Plaintiff
     alleges constitutional violations [under the Fifth, Ninth, and
26   Fourteenth Amendments] and infliction of emotional distress, the
     gravamen of her Complaint is that she is challenging Defendant's
27   ability to bring the Foreclosure Action . . . [thus,] the instant
     case is an in rem — or at least a quasi in rem — action").
28

1   court would necessarily invoke <u>in rem</u> jurisdiction because it

2   would "disturb[] the first court's jurisdiction over the res").

3   Accordingly, the doctrine of prior exclusive jurisdiction

4   dictates that the court dismiss plaintiffs' claims.[4]  <u>See id.</u>

5          C.   <u>Younger Abstention</u>

6          Alternatively, the court finds that dismissal of

7   plaintiffs' claims is warranted under the doctrine of <u>Younger</u>

8   abstention.  The Supreme Court's decision in <u>Younger v. Harris</u>,

9   401 U.S. 37 (1971) and those that have followed "espouse a strong

10  federal policy against federal-court interference with pending

11  state judicial proceedings absent extraordinary circumstances."

12  <u>Middlesex Cnty. Ethics Comm. v. Garden State Bar Assoc.</u>, 457 U.S.

13  423, 431 (1982).  Though abstention is not required "simply

14  because a pending state-court proceeding involves the same

15  subject matter . . . [the Supreme Court] has recognized . . .

16  certain instances in which the prospect of undue interference

17  with state proceedings counsels against federal relief."  <u>Sprint</u>

18  <u>Commc'ns, Inc. v. Jacobs</u>, 571 U.S. 69, 72 (2013) (citing <u>New</u>

19  <u>Orleans Pub. Serv., Inc. v. Council of City of New Orleans</u>, 491

20  U.S. 350, 373 (1989) ("<u>NOPSI</u>")).

21         <u>Younger</u> exemplified one class of cases in which

22  _____

23         [4]   Defendants also urge the court to dismiss plaintiffs'
    claims under the <u>Barton</u> doctrine, which requires that, "before
24  suit is brought against a receiver, leave of the court by which
    he was appointed must be obtained."  <u>Barton v. Barbour</u>, 104 U.S.
25  126, 127 (1881).  Similar to the prior exclusive jurisdiction
    doctrine, the <u>Barton</u> doctrine precludes courts from exercising
26  subject matter jurisdiction over a later-filed and unapproved
    action brought against a receiver appointed by another court.
27  <u>See id.</u>  Because the court finds in this Memorandum and Order
    that the prior exclusive jurisdiction applies, the court need not
28  address whether dismissal under the <u>Barton</u> doctrine is warranted.

1  federal-court abstention is required: when there is a parallel,

2  pending state criminal proceeding, federal courts must refrain

3  from enjoining the state prosecution.  Id.  The Supreme Court has

4  since extended Younger abstention to two additional categories:

5  civil enforcement proceedings and "civil proceedings involving

6  certain orders that are uniquely in furtherance of the state

7  courts' ability to perform their judicial functions."  Id.

8  (citing NOPSI, 491 U.S. at 367-78).  "[T]hese three categories

9  are known as the NOPSI categories."  Herrera v. City of Palmdale,

10 918 F.3d 1037, 1044 (9th Cir. 2019).

11        If the state proceeding falls into one of the NOPSI

12 categories, Younger abstention is appropriate as long as three

13 additional factors, known as the Middlesex factors, are met: the

14 state proceeding must be "(1) 'ongoing,' (2) 'implicate important

15 state interests,' and (3) provide 'an adequate opportunity . . .

16 to raise constitutional challenges.'"  Herrera, 918 F.3d at 1044

17 (quoting Middlesex, 457 U.S. at 432).

18        1.   Whether the Conservation Proceeding falls into one
19             of the NOPSI Categories

20        The first and third NOPSI categories do not accommodate

21 the Conservation Proceeding.  The Conservation is plainly civil,

22 not criminal, and does not involve the sort of order that

23 uniquely touches on the state court's ability to perform its

24 judicial function.  See Sprint, 571 U.S. at 79.  Unlike cases

25 like Juidice v. Vail, 430 U.S. 327, 336 (1977), or Pennzoil Co.

26 v. Texaco, Inc., 481 U.S. 1, 13 (1987), this case does not

27 involve orders such as a contempt order or an order to post bond

28 pending appeal--orders through which the state "compels

18

1   compliance with the judgments of its courts."

2          The court finds, however, that the Conservation falls

3   within the second NOPSI category for certain civil enforcement

4   proceedings.  The civil enforcement proceedings to which Younger

5   applies are "akin to a criminal prosecution" in "important

6   respects," in that they

7              are characteristically initiated to sanction
               the federal plaintiff, i.e., the party
8              challenging the state action, for some
               wrongful act. In cases of this genre, a
9              state actor is routinely a party to the
               state proceeding and often initiates the
10             action. Investigations are commonly
               involved, often culminating in the filing of
11             a formal complaint or charges.

12  Bristol-Myers Squibb Co. v. Connors, 979 F.3d 732, 735–36 (9th

13  Cir. 2020) (quoting Sprint, 571 U.S. at 79 (citations omitted)).

14  The Ninth Circuit has cautioned that, in setting forth these

15  characteristics, the Supreme Court "described the characteristics

16  of quasi-criminal enforcement actions in general terms by noting

17  features that are typically present, not in specific terms by

18  prescribing criteria that are always required."  Id.

19          California conservation proceedings resemble the civil

20  enforcement actions described in Sprint.  California Insurance

21  Code § 1011 authorizes the Commissioner, "acting under and within

22  [the State's] police power," Carpenter v. Pac. Mut. Life Ins. Co.

23  of Cal., 10 Cal. 2d 307, 331 (Cal. 1937), to apply for an order

24  from the superior court establishing a conservatorship over an

25  insurance provider if one or several conditions are present: if

26  an insurer "has violated its charter or any law of the state,"

27  id. at § 1011(e), if an "officer or attorney in fact of the

28  person has embezzled, sequestered, or wrongfully diverted any of

the assets of the person," id. at § 1011(g), if the insurer has

not "compl[ied] with the requirements for the issuance to it of a

certificate of authority," id. at § 1011(h), or if the insurer,

"without first obtaining the consent in writing of the

commissioner, has transferred, or attempted to transfer,

substantially its entire property or business or, without

consent, has entered into any transaction the effect of which is

to merge, consolidate, or reinsure substantially its entire

property or business in or with the property or business of any

other person," id. at § 1011(c).

Even the provisions of § 1011 authorizing conservation

based on the financial health of an insurer are inextricably

linked to California laws requiring adequate capitalization,

reserves, and other mandates governing the company's relationship

to its policyholders.  See, e.g., Cal. Ins. Code § 923.5 ("Each

insurer transacting business in this state shall at all times

maintain reserves in an amount estimated in the aggregate to

provide for the payment of all losses and claims for which the

insurer may be liable . . . .").  Section 1011 therefore provides

the Commissioner with a tool to enforce various provisions of the

Insurance Code and protect the public once he determines that an

insurance provider has committed a "wrongful" or harmful action

by violating one of the Code's provisions.  See Cal. Ins. Code

§ 1011; (Superior Court's Order Denying CIC's Application to

Vacate the Conservation Order, at 4 ("The Legislature has given

the Commissioner the discretion to deal with this case under

either section 1011 or section 1215.2 and the choice of

enforcement tool is [his] to make.")).

1          The process of applying for a conservation and
2    formulating a rehabilitation plan also involves "investigation."
3    Sprint, 571 U.S. at 179-80.  The Superior Court is only
4    authorized to order a conservation "upon the filing by the
5    commissioner of [a] verified application showing any of the
6    conditions" set out in § 1011 exist.  See Cal. Ins. Code § 1011.
7    The Commissioner must perform an investigation to determine if
8    any of those conditions exist and bring a verified application
9    before the superior court, akin to a "formal complaint or
10   charges."  Sprint, 571 U.S. at 179-80.  The Commissioner must
11   similarly investigate and file a verified application with the
12   superior court before the court may order a rehabilitation plan
13   or terminate the conservation.  See Cal. Ins. Code §§ 1012, 1043.

14         Plaintiffs present several arguments as to why the
15   Conservation Proceeding cannot constitute a civil enforcement
16   action, none of which is persuasive.  Plaintiffs first argue that
17   the Conservation Proceeding is not aimed at "sanctioning" CIC for
18   any wrongful act because, once a conservation has been imposed,
19   it becomes the Commissioner's "duty to operate the company and to
20   try to remove the causes leading to its difficulties,"
21   Carpenter, 10 Cal. 2d at 331, and once the condition that led to
22   the conservation has been lifted, the conservation is complete
23   and must also be lifted.  (See Pls.' Opp'n at 51-52.)  If the
24   Commissioner had intended to sanction CIC, plaintiffs contend, he
25   would have pursued injunctive relief under California Insurance
26   Code § 1215.2, rather than a conservation.

27         Not only does it strain credulity to accept that an
28   order seizing a company's assets and vesting title to and control

21

over them in a state official does not constitute a "sanction,"
the Supreme Court has rejected the premise that <u>Younger</u>
abstention is inappropriate simply because a proceeding may be
aimed at "remedying" harmful conduct.  <u>See</u> <u>Sprint</u>, 571 U.S. at
593 n.6 (rejecting inquiry adopted by several courts of appeals
as to whether a state proceeding is "coercive" rather than
"remedial" as not "necessary or inevitably helpful, given the
susceptibility of the designations to manipulation"); <u>see also</u>
<u>Worldwide Church of God, Inc. v. State of Cal.</u>, 623 F.2d 613, 614
(9th Cir. 1980) (affirming abstention over suit, brought by
California Attorney General, to enjoin court-appointed
receivership of a church to prevent diversion of church assets).

       Whether its purpose is remedial or coercive, the
California Insurance Code authorizes the Commissioner to apply
for a conservation if an insurer has committed any of the
wrongful acts set forth in § 1011(a)-(j).  As plaintiffs' counsel
acknowledged at oral argument, the court must employ a
categorical approach when assessing whether <u>Younger</u> abstention
applies to a particular type of state proceeding.  <u>See</u> <u>Bristol-</u>
<u>Meyers Squibb</u>, 979 F.3d at 737 ("What matters for <u>Younger</u>
abstention is whether the state proceeding falls within the
general class of quasi-criminal enforcement actions--not whether
the proceeding satisfies specific factual criteria.").  The court
therefore will not "accept [plaintiffs'] invitation to scrutinize
the particular facts" of the Conservation Proceeding to determine
whether the Commissioner's decision to pursue a conservation
rather than injunctive relief to enforce the provisions of the
California Insurance Code was appropriate.  <u>See</u> <u>Bristol-Myers</u>

1    Squibb, 979 F.3d at 737.[5]

2              Plaintiffs further argue that Younger abstention is not

3    appropriate in this case because they are not the subject of the

4    Conservation Proceeding--rather, CIC is.  (See Pls.' Opp'n at 51-

5    52.)  While Younger abstention traditionally applies when the

6    federal plaintiffs are defendants in the ongoing state

7    proceeding, most circuits, including the Ninth Circuit, have

8    upheld decisions to abstain under Younger where the parties to

9    the federal and state actions are not identical, but are "so

10   closely related that they should all be subject to the Younger

11   considerations which govern any one of them."  See Herrera, 918

12   F.3d at 1046-47 (holding that co-founder of a motel subject to a

13   state-court nuisance proceeding, as well her children, who lived

14   at the motel, had sufficiently intertwined interests to warrant

15   abstention); Hicks v. Miranda, 422 U.S. 332, 348-49 (1975)

16   (holding that abstention from adjudicating a suit by owners of an

17   adult movie theater to recover their obscene films was

18   appropriate because the owners' interests were sufficiently

19   "intertwined" with those of their employees, who faced

20   prosecution in state court for showing the films).

21             Here, CIC and plaintiffs are both subject to the

22

23        [5]    Plaintiffs also suggest that the Conservation
     Proceeding should not be considered a civil enforcement action
24   because defendants have utilized private counsel, rather than
     turning to the California Attorney General's Office.  (See Pls.'
25   Opp'n at 55-56.)  The Ninth Circuit has expressly stated,
     however, that the State's choice of counsel is irrelevant for
26   determining whether the state proceeding qualifies for Younger
     abstention.  See Bristol-Myers Squibb, 979 F.3d at 736 ("We see
27   no reason why the application of Younger should turn on the
     State's choice of lawyers.").
28

1   management and control of Steven Menzies and Jeffrey Silver.

2   (See FAC ¶¶ 48, 51, 52; Defs.' Req. for Judicial Notice, Exs. 8,

3   9.)  Applied and ARS' operative agreements with CIC indicate that

4   they both remain subject to CIC's supervision and control or act

5   as its behalf as its agent.  (See Defs.' Req. for Judicial

6   Notice, Exs. 1, 2.)  Plaintiffs also allege in their complaint

7   that their income stream and value depend on providing policy and

8   payroll services to CIC policyholders.  (See FAC ¶ 49.)  In fact,

9   plaintiffs' complaint is replete with allegations that their

10  reputation is connected to that of CIC's, and that imposition of

11  the Conservation has severely impaired plaintiffs' goodwill and

12  standing in the business community.  (See id. at ¶¶ 127, 131,

13  134, 142, 176.)  Any interests plaintiffs have in "contractual

14  rights with CIC," id. at ¶ 168, are wholly derivative of CIC's

15  right to continue operating in California--precisely what it is

16  at issue in the pending Conservation Proceeding.  Plaintiffs'

17  interests are therefore not only aligned with CIC's, they are

18  wholly "intertwined" in that they share the same interest in

19  contesting the validity of the state litigation.  See Herrera,

20  918 F.3d at 1047 ("The federal claims of Mona and her children

21  present the same risk of interference in the state proceeding as

22  do the federal claims of Bill and Palmdale Lodging--indeed, all

23  the federal plaintiffs seek the same relief from the state court

24  proceedings.").

25         Finally, plaintiffs argue that conservation proceedings

26  cannot give rise to Younger abstention because they involve

27  different procedural protections and burdens of proof than

28  criminal prosecutions and analogous civil enforcement

                                   24

1    proceedings.  (See Pls.' Opp'n at 53.)  Specifically, plaintiffs

2    contend that the Superior Court reviews the Commissioner's

3    actions in conservation proceedings under a deferential "abuse of

4    discretion" standard, In re Exec. Life Ins. Co., 32 Cal. App. 4th

5    at 358 (requiring only that the Commissioner's actions be

6    "reasonably related to the public interest" and "not be arbitrary

7    or improperly discriminatory"), that the burden rests on the

8    conserved party to establish that the condition giving rise to

9    the conservation no longer exists, Cal. Ins. Code § 1012, and

10   that many provisions of the California Code of Civil Procedure

11   governing statements of decision, post-trial motions, and

12   automatic stays pending appeal do not apply to conservation

13   proceedings.  (See Pls.' Opp'n at 53-54; Pls.' Supp. Authority in

14   Support of Opp'n (Docket No. 48).)

15          As discussed further below, the fact that certain

16   provisions of the Code of Civil Procedure do not apply to

17   conservation proceedings does not diminish the state court's

18   ability to adjudicate plaintiffs' claims, constitutional or

19   otherwise.  More crucially, none of these factors were discussed

20   by the Supreme Court when listing the "important respects" in

21   which a civil proceeding must be akin to a criminal proceeding to

22   determine if Younger should apply.  See Sprint, 571 U.S. at 79.

23   After all, civil proceedings typically apply different standards

24   of review than criminal proceedings, and most involve different

25   procedural protections.

26          Ultimately, plaintiffs do not identify a single case in

27   which a court has found that the burden of proof, standard of

28   review, or applicability of the Code of Civil Procedure should

                                  25

1   affect whether a civil proceeding is considered a "civil

2   enforcement action" for the purposes of Younger abstention.  To

3   the contrary, courts analyzing whether state enforcement

4   proceedings qualify for Younger abstention under Sprint have

5   largely focused on whether the state itself initiated the

6   proceeding, and whether the proceeding is aimed at sanctioning a

7   party for some wrongful act--factors which, as described above,

8   are met by California conservation proceedings.  See, e.g.,

9   Sprint, 571 U.S. at 80 (holding that Younger did not apply

10  because "a private corporation, Sprint, initiated the action . .

11  . no state authority conducted an investigation into Sprint's

12  activities," and "the [state agency's] adjudicative authority was

13  invoked to settle a dispute between two private parties, not to

14  sanction Sprint for commission of a wrongful act"); ReadyLink

15  Healthcare, Inc. v. State Compensation Ins. Fund, 754 F.3d 754,

16  760 (9th Cir. 2014) (holding that Younger did not apply to state

17  court proceedings because the proceedings involved a dispute

18  between private parties, which was adjudicated by a state

19  officer).

20       For these reasons, the court finds that the

21  Conservation Proceeding is a civil enforcement proceeding for the

22  purposes of determining whether abstention is appropriate.

23           2.   Whether the Middlesex Factors are Met

24       To qualify for Younger abstention, the Conservation

25  Proceeding must also (1) be ongoing, (2) "implicate important

26  state interests," and (3) there must be "an adequate opportunity

27  in the state proceedings to raise constitutional challenges."

28  ReadyLink, 754 F.3d at 759 (quoting Middlesex, 457 U.S. at 432).

Plaintiffs do not dispute that the Conservation Proceeding is ongoing.  (See Pls.' Opp'n at 60.)  They do, however, dispute that factors (2) or (3) are met in this case.

### a.   Important State Interests

The Younger doctrine recognizes that a state's ability to enforce its laws "'against socially harmful conduct that the State believes in good faith to be punishable under its laws and Constitution'" is a "basic state function" with which federal courts should not interfere.  Miofsky v. Superior Court of the State of Cal., in and for Sacramento Cnty, 703 F.2d 332, 336 (9th Cir. 1983) (quoting Younger, 401 U.S. at 51–52).  "Where the state is in an enforcement posture in the state proceedings, the 'important state interest' requirement is easily satisfied, as the state's vital interest in carrying out its executive functions is presumptively at stake."  Potrero Hills Landfill, Inc. v. Cnty. of Solano, 657 F.3d 876, 884 (9th Cir. 2011) (citing Fresh Int'l Corp. v. Agric. Labor Rels. Bd., 805 F.2d 1353, 1360 n.8 (9th Cir. 1986)).

Here, California conservation proceedings implicate the state's interest in ensuring compliance with California Insurance Code provisions, including provisions that require the Commissioner's consent before an insurer attempts to transfer substantially its entire property or business or enters into a merger.  See Cal. Ins. Code §§ 1011(c), 1215.2; Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 733 (1996) (Kennedy, J., concurring) ("States, as a matter of tradition and express federal consent, have an important interest in maintaining precise and detailed regulatory schemes for the insurance

industry.").  Plaintiffs' own complaint acknowledges that plaintiffs, CIC, and Menzies created a new entity in New Mexico and sought to merge CIC with that entity to effect the Berkshire Hathaway ownership transfer.  (See FAC ¶ 66.)  Upon learning of these plans, defendants assumed an enforcement posture in state court, filing an application for a conservation "to prevent this illegal transfer . . . ."  (See Pls.' Req. for Judicial Notice, Ex. P2 at ¶ 4.)

Plaintiffs argue that defendants cannot simply "invo[ke] . . . the subject matter of California Insurance law" to argue that the Conservation Proceeding implicates important state interests.  (See Pls.' Opp'n at 62 (quoting Potrero Hills, 657 F.3d at 884 ("[I]t is not the bare subject matter of the underlying state law that we test to determine whether the state proceeding implicates an 'important state interest' for Younger purposes.")).)  However, plaintiffs overlook the Ninth Circuit's statement later in Potrero Hills that "the content of state laws becomes 'important' for Younger purposes . . . when coupled with the state executive's interest in enforcing such laws."  Potrero Hills, 657 F.3d at 885 ("Had Solano County enforced Measure E against Potrero Hills and denied it the revised Use Permit, no doubt the second Younger requirement would be satisfied.").  Because the State, through the Commissioner, is indisputably in an enforcement posture in this case, the content of California's state insurance laws is a relevant--indeed, persuasive--factor indicating that the Conservation Proceeding satisfies the second Middlesex factor.

Plaintiffs further argue that the Conservation

28

1 Proceeding cannot implicate important state interests because

2 defendants had allegedly concluded that the CIC-CIC II merger

3 would not harm policyholders and, in any event, CIC had allegedly

4 agreed not to move forward with the merger.  (See Pls.' Opp'n at

5 61-62.)  Plaintiffs again contend that defendants have never

6 explained why a conservation, rather than other relief, such as

7 an injunction, was necessary to stop the merger.  (See id.)  This

8 argument does not alter the court's analysis, however, because,

9 as the court has already noted, the court does "not look narrowly

10 to [the State's] interest in the outcome of the particular case,"

11 but instead to "the importance of the generic proceedings to the

12 State."  NOPSI, 491 U.S. at 365 (emphasis omitted).  The court

13 therefore concludes that the second Middlesex factor is met.

14                    b.    Adequate Opportunity to Raise Constitutional
                            Challenges
15

16          The inquiry under the third Middlesex prong is whether

17 the Conservation Proceeding will provide plaintiffs a sufficient

18 forum for raising their federal constitutional challenges.

19 Younger abstention reflects a general sense of respect for the

20 integrity of state proceedings, and a presumption "that state

21 procedures will afford an adequate remedy, in the absence of

22 unambiguous authority to the contrary."  Pennzoil, 481 U.S. at

23 15.  Thus, "[w]here vital state interests are involved, a federal

24 court should abstain 'unless state law clearly bars the

25 interposition of the constitutional claims.'"  Lebbos v. Judges

26 of Superior Court, 883 F.2d 810, 815 (9th Cir. 1989) (quoting

27 Middlesex, 457 U.S. at 432).  This factor "does not turn on

28 whether the federal plaintiff actually avails himself of the

1   opportunity to present federal constitutional claims in the state

2   proceeding, but rather whether such an opportunity exists."

3   Herrera, 918 F.3d at 1046; Canatella v. Cal., 404 F.3d 1106, 1111

4   (9th Cir. 2005).  "[T]he burden on this point rests on the

5   federal plaintiff to show 'that state procedural law barred

6   presentation of [its] claims.'"  Pennzoil, 481 U.S. at 14.

7            Plaintiffs first argue that they cannot influence the

8   Conservation Proceeding because they are not parties to it,

9   relying primarily on Vasquez v. Rackauckas, 734 F.3d 1025 (9th

10  Cir. 2013).  Plaintiffs contend that federal plaintiffs who are

11  nonparties to the proceedings in state court need not attempt to

12  intervene in the state court proceedings or prove the inadequacy

13  of those proceedings to avail themselves of their right to

14  proceed in federal court.  See Vasquez, 734 F.3d at 1035

15  ("Younger abstention cannot apply to one . . . who is a stranger

16  to the state proceeding.").  However, the situation in this case

17  is distinct from the one in Vasquez.  There, the federal

18  plaintiffs were affirmatively excluded from the state proceedings

19  at issue: the Orange County District Attorney "initially named

20  Plaintiffs as parties in the Superior Court action but

21  unilaterally dismissed them . . . precisely because of

22  Plaintiffs' 'effort . . . to fight'--that is, to present a

23  defense in state court."  Id.  Vasquez held that dismissal of the

24  plaintiffs had made them "strangers" to the state case and caused

25  their interests to diverge from those against whom the state

26  court order was issued (as those who remained in the case did not

27  contest their status as gang members to whom the injunction would

28  apply).  See id.

1          Plaintiffs, by contrast, have not been excluded from
2    participating in the Conservation Proceeding.  Although there is
3    no statutory provision governing conservation proceedings that
4    expressly permits third parties to intervene, conservation
5    proceedings under California law differ from other civil actions
6    in that a multitude of persons typically have stakes in the
7    proceeding, and, therefore, the Superior Court judge has the
8    flexibility to employ procedures appropriate to the rights to
9    claimants and the orderly conduct of the conservation.  See,
10   e.g., In re Exec. Life Ins. Co., 32 Cal. App. 4th at 391
11   (describing how third parties were invited to participate in
12   hearing before conservation court and allowed to raise due
13   process arguments on appeal).  Specifically in this case, the
14   Superior Court has expressly invited plaintiffs to submit any
15   objections--constitutional or otherwise--they have to the
16   Proposed Rehabilitation Plan in writing and orally at the hearing
17   on the Commissioner's application to approve the Plan.
18   (Procedural Order at 2-4.)

19          CIC will also be able to adequately represent
20   plaintiffs' interests in the state proceeding.  As already
21   discussed, plaintiffs and CIC remain under common management and
22   control of Steven Menzies and Jeffrey Silver.  (See FAC ¶¶ 48,
23   49.)  Plaintiffs interests vis a vis the Conservation Proceeding
24   are shared by CIC, as all of plaintiffs' alleged injuries stem
25   from the same Conservation Order and Proposed Rehabilitation Plan
26   that the Commissioner seeks to impose on CIC.  See Hicks v.
27   Miranda, 422 U.S. 332, 348-49 (1975) (holding that interests of
28   owners of adult movie theater were intertwined with those of

1  their employees in showing that the basis for the state

2  prosecution for showing obscene material--brought only against

3  the employees--was unconstitutional).  This case is therefore

4  unlike Doran v. Salem Inn, 422 U.S. 922, 928-29 (1975), where the

5  Supreme Court held that two bar owners who sought an injunction

6  in federal court against the operation of a local ordinance

7  prohibiting topless entertainment in bars could proceed with

8  their federal case because they were "apparently unrelated in

9  terms of ownership, control, and management" from a third bar

10  owner who was prosecuted in state court.

11      Plaintiffs further argue that certain procedural

12  characteristics of California conservation proceedings either

13  have or will preclude them from adequately presenting their

14  constitutional claims to the state court.  (See Pls.' Opp'n at

15  69-72.)[6]  Plaintiffs point to the fact the Commissioner only has

16  to prove that he has determined that grounds for conservation

17  exist--rather than proving that the grounds in fact exist--when

18  initially applying for a conservation order ex parte under

19  Insurance Code § 1011; that the burden shifts to the conserved

20  party or the Commissioner to show that the condition which gave

21  rise to the conservation no longer exists under § 1012; that

22  conservation proceedings are not subject to California Code of

23  Civil Procedure § 632 regarding findings of fact or conclusions

24  of law; and that the appellate court presumes there was a

25      [6]   Plaintiffs listed their grievances regarding the
26  procedures employed by California superior courts in conservation
    proceedings on a PowerPoint slide presented at Oral Argument.
27  (Docket No. 53).  While the court does not reproduce this list
    verbatim, the substance of plaintiffs' objections is addressed
28  herein.

1   reasonable factual basis for the lower court's decision as
2   evidence of their inability to present constitutional claims to
3   the state court.  See Fin. Indem. Co. v. Superior Ct. In & For
4   Los Angeles Cnty., 45 Cal. 2d 395, 401 (1955) (quoting Caminetti
5   v. Imperial Mut. L. Ins. Co., 59 Cal. App. 2d 476, 487 (1942));
6   Garamendi, 128 Cal. App. 4th at 461 (2005) (citing Carpenter, 10
7   Cal. 2d at 328 (1937)).

8        Some of these objections ignore other provisions of
9   California law that provide additional opportunities to object to
10  the conservation proceedings and other procedural protections.
11  For instance, while the Superior Court may defer to the
12  Commissioner's judgment as to whether a conservation is warranted
13  under § 1011, § 1012 guarantees the conserved party a full
14  hearing before the court to show that the ground which gave rise
15  to the conservation no longer exists, a process which has
16  repeatedly been upheld as satisfying due process by state and
17  federal courts who have considered the issue.  See, e.g., Rhode
18  Island, 95 Cal. App. 2d 220, 238-39 (1st Dist. 1949).  Plaintiffs
19  also ignore the substantial body of published appellate cases
20  arising from California conservation proceedings, which
21  demonstrates that, although superior courts are not required to
22  issue formal findings of fact or conclusions of law, appellate
23  courts routinely receive decisions and records from the
24  conservation court sufficient to permit appellate review,
25  including of constitutional objections.  See, e.g., Carpenter, 10
26  Cal. 2d at 328-29; In re Exec. Life Ins. Co., 32 Cal. App. 4th at
27  391.

28       This substantial body of case law also reveals that

33

1    plaintiffs' objections suffer from a more fundamental defect:

2    none of the purported infirmities to which plaintiffs point show

3    that plaintiffs have or will be barred from presenting their

4    constitutional claims, as it is their burden to show.  See

5    Pennzoil, 481 U.S. at 14.  To the contrary, California case law

6    shows that constitutional objections may be raised in a motion to

7    lift the conservation, in conjunction with the Superior Court's

8    review of the Proposed Rehabilitation Plan, or on subsequent

9    appeals from decisions of the Superior Court.

10          In Carpenter v. Pacific Mutual Life Insurance of

11   California, for instance, non-conserved third parties appealed

12   the conservation court's approval of the rehabilitation plan for

13   Pacific Mutual Life on grounds that it violated the Due Process,

14   Equal Protection, and Contract Clauses of the United States

15   Constitution.  Carpenter, 10 Cal. 2d at 328-29.  The California

16   Supreme Court heard the third-parties' constitutional arguments

17   and affirmed the conservation court's approval of the plan.  Id.

18   at 331, 335, 341.  The United States Supreme Court affirmed the

19   decision as well.  Neblett v. Carpenter, 305 U.S. 297 (1938).  A

20   number of other decisions by California Courts of Appeals

21   illustrate that state appellate courts routinely hear

22   constitutional challenges to procedures employed by the Superior

23   Court.  See, e.g., In re Exec. Life Ins. Co., 32 Cal. App. 4th at

24   391 (reviewing third party's First Amendment claims raised before

25   conservation court); Rhode Island, 95 Cal. App. 2d at 238-39

26   (reviewing constitutional objections to § 1012 on petition for

27   writ of mandate directing Superior Court to vacate its order

28   appointing conservator).

34

1    Here, plaintiffs have already been invited to present

2    their objections to the Proposed Rehabilitation Plan as part of

3    the Superior Court's consideration of whether to approve the

4    Plan.  (See Procedural Order at 3.)  Plaintiffs will be free to

5    pursue interlocutory review of the Superior Court's orders

6    through emergency writ--an avenue CIC has already pursued, albeit

7    unsuccessfully, because the Court of Appeal was unconvinced that

8    it was entitled to emergency relief--or other appellate review of

9    the Superior Court's decisions within the California court system

10   and, ultimately, the United States Supreme Court.  See Rhode

11   Island, 95 Cal. App. 2d at 238-39; Carpenter, 10 Cal. 2d at 328-

12   41; Neblett, 305 U.S. at 297.

13   California's courts are entitled to the presumption

14   that these avenues for challenging the Conservation Proceeding on

15   constitutional grounds will satisfy the law.  See Pennzoil, 481

16   U.S. at 14 ("We must assume that state procedures afford an

17   adequate remedy, in the absence of unambiguous authority to the

18   contrary.").  Because plaintiffs have failed to point to any

19   "unambiguous authority" to the contrary, Pennzoil, 481 U.S. at

20   14, the court finds that the third Middlesex factor also weighs

21   in favor of abstention.[7]

22   ─────────────

23   [7]    The Ninth Circuit has articulated an "implied fourth
     requirement that the federal court action would enjoin the
     proceeding, or have the practical effect of doing so."  Potrero

24   Hills, 657 F.3d at 882.  For the same reasons that the court has
     found that adjudicating plaintiffs' claims in the federal action

25   would require the court to assert in rem or quasi in rem
     jurisdiction by "disturbing" the state court's control over the

26   res, see Section II.B., supra, the court finds that this implied
     requirement is amply met.  Not only does plaintiffs' operative

27   complaint seek an order directing the Commissioner to "take all

28   necessary steps to end CIC's conservatorship," it seeks orders

1
2

### 3.   Younger Exceptions for "Bad Faith" and "Irreparable Injury"

3      Even if all the requirements for Younger abstention

4  have been met, the Supreme Court has stated that a federal court

5  must nevertheless intervene in a state proceeding upon a showing

6  of "bad faith, harassment, or any other unusual circumstance that

7  would call for equitable relief."  See Younger, 401 U.S. at 45.

8  "A plaintiff who seeks to head off Younger abstention bears the

9  burden of establishing that one of the exceptions applies."

10  Diamond "D" Const. Corp. v. McGowan, 282 F.3d 191, 198 (2d Cir.

11  2002) (citations omitted).  For the following reasons, no such

12  showing has been made here.

13                  a.   Bad Faith

14      The "bad faith" exception to Younger abstention is

15  narrow: "[o]nly in cases of proven harassment or prosecutions

16  undertaken by officials in bad faith without hope of obtaining a

17  valid conviction . . . is federal injunctive relief against

18  pending state prosecutions appropriate."  Perez v. Ledesma, 401

19  U.S. 82, 85 (1971) (emphasis added); see also Hensler v. Dist.

20  Four Grievance Comm., 790 F.2d 390-92 (5th Cir. 1986) (holding

21  that court should not enjoin state court proceeding without

22  "allegations and proof of bad faith" (emphasis added)).

23  "Evidence of bad-faith harassment must be more than multiple

24  prosecutions, must be more than conclusory statements about

25  motive, must be more than a weak claim of selective prosecution,

26

27  requiring the Commissioner to withdraw the Proposed
   Rehabilitation Plan, an integral part of the Conservation
   Proceeding that defendants have filed pursuant to the Superior
28  Court's Procedural Order.  (See FAC, Prayer for Relief ¶¶ C-G.)

36

and must be more than the prosecution of close cases." <u>Kihagi v. Francisco</u>, No. 15-CV-01168-KAW, 2016 WL 5682575, at *4 (N.D. Cal. Oct. 3, 2016) (citations omitted).  Accordingly, "[t]here is no case since <u>Younger</u> was decided in which the [Supreme] Court has found that the exception for bad faith or harassment was applicable," Wright & Miller, 17B <u>Fed. Prac. & Proc. Juris.</u> § 4255 (3d ed.), and plaintiffs do not cite to a single case from this circuit in which a court has found the bad-faith exception to apply (<u>see</u> Pls.' Opp'n at 74-79).

Plaintiffs have not proven that bad faith exists in this case.  First, it cannot constitute bad faith for defendants to rely on repeated judicial authorizations from California state courts.  <u>See Hicks</u>, 422 U.S. at 351 (search and seizure based on valid judicial warrant cannot lead to finding of bad faith and harassment); <u>Juidice</u>, 430 U.S. at 338 (rejecting bad faith exemption because, though complaint alleged bad faith on the part of creditors, it made no such allegations about the state judges who issued and enforced the contempt orders).  At each step of the Conservation Proceeding, defendants have received authorization to proceed from the Superior Court.

The Superior Court reviewed the Commissioner's <u>ex parte</u> application for an order appointing him as conservator of CIC and ordered that the Conservation Proceeding commence because the Commissioner had found that "the factual and legal conditions exist to conserve CIC pursuant to Insurance Code section 1011, subdivision (c)."  (<u>See</u> Conservation Order at 2.)  The Superior Court subsequently affirmed the decision to impose the Conservation, denying CIC's motion to vacate the Conservation

1   (Defs.' Req. for Judicial Notice, Ex. 10), and the California

2   Court of Appeals denied CIC's writ petition for immediate review,

3   (id. at Ex. 11).  Finally, the Superior Court issued a Procedural

4   Order establishing an orderly process for reviewing the

5   Commissioner's Proposed Rehabilitation Plan after the

6   Commissioner represented that "a rehabilitation plan may well

7   result in CIC ceasing to do business in California."  (Pls.' Req.

8   for Judicial Notice, Ex. P7 at 12 n.5; Defs.' Req. for Judicial

9   Notice, Ex. 10, at 4.)

10          Plaintiffs seek to impeach the Conservation Order by

11  claiming that the Superior Court granted it on false pretenses,

12  as defendants allegedly made several misrepresentations and

13  omissions when applying to the Superior Court.  See (Pls.' Opp'n

14  at 77).  However, CIC presented these exact arguments to the

15  Superior Court when it filed its motion to vacate the

16  Conservation Order, and to the California Court of Appeals when

17  it petitioned for a writ of mandate setting aside the denial of

18  its motion to vacate.  (See Defs.' Req. for Judicial Notice, Exs.

19  13-15.)  Both courts rejected CIC's application, and the Superior

20  Court maintained the conservation, even after becoming aware of

21  the alleged misrepresentations which plaintiffs raise.  See

22  Phelps v. Hamilton, 59 F.3d 1058, 1066 (10th Cir. 1995).

23          Plaintiffs further contend that defendants' inclusion

24  of provisions in the Proposed Rehabilitation Plan requiring

25  plaintiffs and CIC to settle EquityComp lawsuits proves that

26  defendants are using the Conservation to retaliate against

27  plaintiffs for their constitutionally-protected use of the court

28  system and success in prior litigation.  See Cullen v. Fliegner,

38

1  18 F.3d 96, 103 (2d Cir. 1994); (FAC ¶¶ 6-8, 13.)  But in order

2  to show bad faith, plaintiffs must show that "the state

3  proceeding [was] brought with <u>no legitimate purpose</u>." <u>Diamond</u>

4  <u>"D" Const. Corp. v. McGowan</u>, 282 F.3d 191, 200 (2d Cir. 2002).

5  In other words, plaintiffs must prove that "the statute was

6  enforced against them with no expectation of convictions <u>but only</u>

7  to discourage exercise of protected rights." <u>Cameron v. Johnson</u>,

8  390 U.S. 611, 621 (1968) (emphasis added).

9        Plaintiffs' own allegations describe efforts by CIC and

10 plaintiffs to create a New Mexico Company, CIC II, into which CIC

11 could merge its assets to avoid California's regulatory process.

12 (<u>See</u> FAC ¶¶ 64-75.)  The FAC acknowledges that defendants did not

13 consent to the merger, as they warned CIC that the merger would

14 extinguish its certificate of authority by operation of law.

15 (<u>See</u> <u>id.</u>)  Probable cause therefore existed to believe that CIC

16 was attempting to merge with another entity or transfer

17 substantially its entire property to another person without

18 consent, a valid basis for instituting conservation proceedings

19 under California Insurance Code § 1011(c).  Because plaintiffs'

20 own allegations provide a valid basis for the Conservation, and

21 because defendants' actions have received repeated authorization

22 from state courts, this court cannot find that the state

23 proceeding lacks "[any] legitimate purpose," and instead must

24 find that plaintiffs have failed to prove the existence of bad

25 faith in this case.  <u>See</u> <u>Diamond "D"</u>, 282 F.3d at 200.[8]

26

27        [8]  The fact that plaintiffs ask this court to intervene in
   the state proceeding to effectively enjoin the Superior Court
   from ruling on the validity of the Proposed Rehabilitation plan,
28 before the Superior Court has even had a chance to issue its own

1

b.   <u>Irreparable Injury</u>

2          To establish the irreparable injury exception to

3    <u>Younger</u> abstention, plaintiffs must show the existence of

4    "extraordinary circumstances" that present a "danger of

5    irreparable loss [that] is both great and immediate."  <u>Younger</u>,

6    401 U.S. at 45.  "[S]uch circumstances must be 'extraordinary' in

7    the sense of creating an extraordinarily pressing need for

8    immediate federal equitable relief, not merely in the sense of

9    presenting a highly unusual factual situation.'"  <u>Moore v. Sims</u>,

10   442 U.S. 415, 433 (1979) (quoting <u>Kugler v. Helfant</u>, 421 U.S.

11   117, 124 (1975)).

12         Plaintiffs contend that the alleged deprivation of

13   their constitutional rights as a result of the Conservation

14   constitutes such an "extraordinary circumstance."  However, if

15   allegations that a plaintiff's constitutional rights were being

16   violated were sufficient to constitute "extraordinary

17   circumstances," this exception to <u>Younger</u> would swallow the rule.

18   As the Supreme Court stated in <u>NOPSI</u>, "it is clear that the mere

19
20   ruling, underscores the propriety of <u>Younger</u> abstention in this
     case.  Even if the court were to agree with plaintiffs that the
21   provisions of the Proposed Rehabilitation Plan violate
     plaintiffs' Constitutional rights to Due Process and Free
22   Expression, or constitute a taking without just compensation, it
     is possible that the Superior Court will approve a version of the
23   Rehabilitation Plan that does not include these provisions or
     will deny the Commissioner's request entirely.  <u>Younger</u>
24   abstention embodies a policy whereby federal courts "give [the]
     state[] the first opportunity--but not the only, or last--to
25   correct those errors of a federal constitutional dimension that
     infect its proceedings."  See <u>Diamond "D"</u>, 282 F.3d at 200.
26   Intervening in the Conservation Proceeding to wrest the decision
     as to the Proposed Rehabilitation Plan's validity in the first
27   instance away from the Superior Court would violate this
     principle.
28

40

1  assertion of a substantial constitutional challenge to state

2  action will not alone compel the exercise of federal

3  jurisdiction." NOPSI, 491 U.S. at 365.

4        Plaintiffs argue that the harm the Conservation has

5  caused them is "irreparable" because they will be unable to

6  recover money damages in this case.  (See Pls.' Opp'n at 79.)

7  Cal. Pharmacists Ass'n v. Maxwell-Jolly, 563 F.3d 847, 852 (9th

8  Cir. 2009), cited by plaintiffs, was a preliminary injunction

9  case, not a Younger abstention case.  Plaintiffs offer no basis

10  to apply the standard for a preliminary injunction here, where

11  the exception requires not only irreparable harm but

12  "extraordinary circumstances," and provide no further explanation

13  as to why this case would present extraordinary circumstances.

14  The court therefore finds that plaintiffs have failed to

15  establish any of the Younger exceptions which would prevent its

16  application in this case.

17        In sum, defendants have established that the

18  Conservation Proceeding falls under the NOPSI category for civil

19  enforcement proceedings, that the three Middlesex factors are

20  met, that this action would have the practical effect of

21  enjoining the state court proceeding, and that neither the bad-

22  faith nor exceptional circumstances exceptions apply.

23  Accordingly, dismissal under Younger is appropriate.  See

24  Younger, 401 U.S. at 37.

25        IT IS THEREFORE ORDERED that defendants' motion to

26  dismiss (Docket Nos. 34-35) be, and the same hereby is, GRANTED.

27  The Clerk is directed to enter Judgment in this action

28  accordingly.

41

Dated:   March 30, 2021

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE